**TERRY et al. v. WITHERSPOON et al.***
(No. 2090.)

(Court of Civil Appeals of Texas. Amarillo.
Oct. 10, 1923. Rehearing Denied Nov. 14,
1923. Second Motion for Rehearing Denied
Dec. 5, 1923.)

**1. Trover and conversion ⬦1—Ownership of
property at time of conversion material on
question of consent.**

In a suit for conversion, the ownership of
the property at the time of the conversion is
material on the question of consent to pos-
session by the then owner.

**2. Chattel mortgages ⬦278—Allegations nec-
essary to cause of action must be sustained
by proof.**

Where plaintiffs, in a foreclosure suit, in
order to recover certain expenditures, were
required to allege that such expenditures were
necessary and reasonable, the burden was on
them to sustain the allegation by competent
proof.

On Motion for Rehearing.

**3. Chattel mortgages ⬦102—Mortgagees in
possession held not authorized under contract
to conduct retail business.**

Where mortgagees of a garage property had
possession for the purpose of selling the prop-
erty for the debt, neither a bill of sale nor a
contract under which the possession was
transferred vested the mortgagees with power
to run the garage as a retail business.

**4. Evidence ⬦471(31)—Conclusions as to ex-
tent of authority while in possession of
mortgaged property held inadmissible.**

Where, in a suit to foreclose liens by mort-
gagees in possession, the extent of the author-
ity of such mortgagees was in issue, evidence by
plaintiffs as to what they concluded or under-
stood from a conversation with defendant as to
their authority was not admissible.

**5. Chattel mortgages ⬦106—Evidence insuf-
ficient to show that mortgagees in possession
had authority to carry on retail business.**

Where plaintiffs, who were defendant's
creditors, under agreement, entered into pos-
session of defendant's garage in order to sell
the property to satisfy the debt, evidence *held*
not to show that plaintiffs had authority to
carry on the business as a retail one, their au-
thority being limited to a sale in bulk.

**6. Chattel mortgages ⬦249—Mortgagee must
choose between sale under power and fore-
closure by suit.**

A mortgagee cannot resort to a sale under
power in the mortgage and at the same time
to a suit foreclosing the mortgage; the rem-
edies being inconsistent.

Boyce, J., dissenting in part.

Appeal from District Court, Deaf Smith
County; Reese Tatum, Judge.

Action by Vern Witherspoon and others
against W. H. Terry and others, with cross-
action by defendants. Judgment for plain-
tiffs, and defendants appeal. Reversed and
remanded.

Jno. P. Slaton and Carl Gilliland, both of
Hereford, and H. G. Hendricks, of Amarillo,
for appellants.

F. T. Roloson, W. H. Russell, and Wm.
M. Knight, all of Hereford, for appellees.

HALL, C. J. This is the second appeal
in this case. The first judgment was re-
versed because the court erred in directing
a verdict. See 239 S. W. 300. The appel-
lees since then have amended their petition.
As amended the petition shows that Vern
Witherspoon, Geo Beams, G. E. Webb, and
E. W. Kinney are seeking to recover of W.
H. Terry, J. G. Terry, and R. A. Terry upon
a promissory note, dated May 1, 1920, in
the sum of $6,695, due six months· after
date, with interest at 10 per cent., and con-
taining the usual stipulation for attorney's
fees.

It is charged that for the purpose· of se-
curing said note the defendants, J. G. and
R. A. Terry, on May 1, 1920, executed and
delivered to Witherspoon a· chattel mortgage
on personal property situated in and used
by the Hereford Garage, and that on May 1,
1920, W. H. Terry executed a deed of trust
to secure said note, conveying the west 400
acres of a certain section of land in Gaines
county, Tex. It is further charged that on
or about October 16, 1920, the defendants
informed plaintiffs that they would not be
able to pay the note when due, on Novem-
ber 1, 1920, and that the parties entered in-
to a verbal agreement whereby W. H. Terry,
acting either for himself or as agents of the
defendants J. G. Terry and R. A. Terry,
agreed that plaintiffs were· to go into joint
possession of the garage with the defend-
ants J. G. Terry and R. A. Terry, and that
plaintiffs would use their efforts in trying
to find a purchaser for the business, and
were to keep the garage open and as a go-
ing concern, and apply the proceeds obtain-
ed from the sale of the business or from
conducting it to the payment of said note,
and that plaintiffs should be paid a reason-
able compensation for their services in con-
ducting said business; that, after entering
into said verbal agreement, plaintiffs imme-
diately went into joint possession of the
property with defendants R. A. and J. G.
Terry, and continued to conduct the busi-
ness in connection with them until about
November 1, 1920, when the defendants R.
A. and J. G. Terry voluntarily abandoned
the business and left said plaintiffs in sole
possession and control thereof; that plain-
tiffs had been active and diligent in trying
to find a purchaser for the business and in
disposing of the property under said agree-
ment, that at the time said parol agreement
was made the defendants R. A. and J. G.

Terry were conducting a garage and automobile repair shop, dealing in and selling automobile tires, repairs, and accessories; that under said parol agreement two of the plaintiffs were employed and rendered services for a part of the time, which services were reasonably worth $150 per month for each man so employed; that on October 20, 1920, in furtherance of said verbal agreement, the said defendants J. G. and R. A. Terry executed and delivered a bill of sale in form, but which was in fact a chattel mortgage, to plaintiffs, by the terms of which said defendants J. G. and R. A. Terry, conveyed to plaintiffs the said stock of merchandise, consisting of parts, repairs, and accessories then in the garage, and at the same time plaintiffs entered into a written contract with the said J. G. and R. A. Terry, which provided that said bill of sale was not received in discharge of said indebtedness due plaintiffs, and would not in any way affect other securities held by plaintiffs for the indebtedness of the defendants, but that plaintiffs would take charge of the property named in the bill of sale, and use their efforts in selling such property and turning same into cash and other property, and the proceeds to be used in paying the necessary expenses in looking after and carrying on the business, and that any excess should be applied to the note held by plaintiffs. It was further charged that the purpose and intent of the parties was that said bill of sale and contract should create a lien upon the property and operate as a chattel mortgage thereon, and for the purpose of placing plaintiffs in possession of the property to further secure the payment of said note.

Plaintiffs offer in said pleading to account to defendants for all money received and expended by them in running and managing the business while they had charge of it, alleging that the receipts aggregated $24,426.33 and that the expenditures aggregated $24,230.77. The prayer is for judgment for the amount of the note, principal, interest, and attorney's fees, and a foreclosure of the liens upon the real estate and personal property described therein. Since the judgment was reversed the defendants, W. H., R. A. and J. G. Terry, have filed their first amended original answer, in which they admit the execution and delivery of the note sued upon, as well as the chattel mortgage and deed of trust. The execution of the bill of sale and contract, dated October 20, 1920, is also admitted, but they deny that said instruments were executed for the purposes charged in the petition, and allege that the defendants J. G. and R. A. Terry were induced to execute said bill of sale and enter into said contract by false and fraudulent representations made by plaintiffs to them, to the effect that their father, W. H. Terry, who owned the garage, tools, goods, etc., had authorized the said J. G. Terry and R. A. Terry to execute said bill of sale and contract and to deliver the possession of the property and business to plaintiffs; that after the said bill of sale and contract were executed plaintiffs, as a result of the conspiracy between themselves and H. B. Webb, to defraud defendants, took possession of all of said property, and have converted the same to their own use. It is further alleged that the defendant W. H. Terry did not authorize his sons, defendants, R. A. and J. G. Terry, to execute said bill of sale and contract, or either of them, but that, upon the fraudulent representation of the plaintiffs, the defendants J. G. Terry and R. A. Terry believed that their father, W. H. Terry, had directed them to execute said instruments and deliver possession of the property to plaintiffs; that, if said representations had not been made, and if they had not believed them to be true, they would not have executed said bill of sale and contract, and would not have delivered possession of the property to Witherspoon and his co-plaintiffs. They allege that said fraudulent representations were willfully and maliciously made; that plaintiffs took charge of and converted the property before maturity of the note; that H. B. Webb had fraudulently conspired with plaintiffs in order to get possession of the property, and assisted and acted with them in taking possession of the same; that upon the date of the conversion thereof the property was of the value of $13,000; that W. H. Terry was the owner of the property when it was converted; that, if he was not the owner thereof, then that J. G. and R. A. Terry had assigned their cause of action herein, by reason of the conversion to him. They asked damages in reconvention for the value of the property and for $10,000 exemplary damages.

H. B. Webb answered the defendants' cross-action by a general demurrer and general denial. By a supplemental petition plaintiffs demur generally to the answer, and deny the facts set up in the cross-action. The case was tried to a jury, and in reply to special issue the jury found as follows: (1) That Terry Bros. owned the furniture, fixtures, stock of merchandise, consisting of accessories, repair parts, tools, machinery, acetylene generator, and Ford burning-in stand, on the 20th day of October, 1920, known as the Hereford Garage; (2) that W. H. Terry did, on or before the 18th day of October, 1920, agree that Witherspoon and Kinney, or either of them, jointly with Terry Bros., might take possession of the furniture, fixtures, merchandise, generator, and burning-in stand located in the Hereford Garage and conduct or assist in the management of the business; (3) that W. H. Terry, on or before October 18, 1920, did agree that the possession of said personal property should be given to the plaintiffs for the pur-

pose of securing them and applying the proceeds derived from the business to the payment of the plaintiffs' note and the necessary expenses in conducting the business; (4) that W. H. Terry, in the conversation over the telephone with E. W. Kinney, authorized Kinney to have J. G. and R. A. Terry execute written instruments in substance such as the contract and bill of sale dated October 20, 1920, introduced in evidence. Based upon the verdict the court rendered judgment against W. H. Terry, and J. G. Terry and R. A. Terry for the full amount of the note, foreclosing the chattel mortgage and the deed of trust upon the property described therein. It is further decreed that the defendants take nothing against the plaintiffs or H. B. Webb by reason of their cross-action.

[1] It is contended that the court erred in submitting the first issue, inquiring as to the ownership of the property upon the date of the alleged conversion. In so far as the right of W. H. Terry to recover in his own name is involved, the issue is immaterial, because by assignment he is the present owner of the cause of action. But the ownership of the property at the time of the conversion is material as bearing upon the issue of conversion, which depends upon the consent of the then owner to possession by plaintiffs. If the plaintiffs acted with consent of the then owner there was no conversion. H. E. & W. T. Ry. Co. v. Garrison (Tex. Civ. App.) 37 S. W. 971. The uncontroverted evidence does not show that W. H. Terry owned the property at that time. Upon this issue the testimony is sharply conflicting, and is sufficient to sustain the jury's findings.

In the light of this finding the second, third, and fourth issues become immaterial, because if his sons owned the property at the time of its conversion the consent or acquiescence of W. H. Terry is foreign to the controversy.

[2] In their plea in reconvention the plaintiffs set up that $150 each per month was reasonable compensation for their services after they entered into and took charge of the business, and that the money expended by them was a proper, necessary, and reasonable expenditure in conducting the business. It was necessary for them to make this allegation. The contention of appellant is that there is no evidence whatever to support it and therefore the court erred in rendering a judgment allowing them a recovery for such sums. This contention must be sustained. If the plaintiffs were required to allege that these expenditures were necessary and reasonable they must also sustain the allegation by competent proof. As said by Boyce, Justice, in Nunn v. Brillhart (Tex. Civ. App.) 230 S. W. 862:

"Our courts have held in a variety of cases that, when expenditures are made necessary by the wrong of another, the party making expenditures, before he can recover the amount paid, must show that there was a necessity for incurring the expense and that the amounts paid were reasonable. * * * And we see no reason why the principles announced in these cases should not apply in this instance."

While the rule is ordinarily applied in suits for damages it is equally applicable where a party seeks reimbursement for expenditures made under a contract or as agent, trustee, guardian, and other such relations. Seago v. White, 45 Tex. Civ. App. 539, 100 S. W. 1015; Smallwood v. First State Bank (Tex. Civ. App.) 211 S. W. 474; Wheeler v. Tyler S. E. Ry., 91 Tex. 356, 43 S. W. 876; T. & N. O. Ry. Co. v. Spencer (Tex. Civ. App.) 244 S. W. 1093; 2 C. J. "Agency," §§ 224, 225, 458; 35 Cyc. p. 1577; 38 Cyc. pp. 78–80; 39 Cyc. pp. 329, 331.

Because the court entered a judgment upon the verdict, unsustained by any proof of the reasonableness and necessity of the charges and expenditures, the judgment is reversed, and the cause remanded.

### On Motion for Rehearing.

We held in the original opinion that, because the appellees did not prove that certain items which they had charged against appellants as expenses were reasonable and necessary, the judgment must be reversed. It is insisted in the motion for rehearing that there is always a presumption that an agent or a trustee has acted in good faith in all of his dealings until the contrary is shown. This is the general rule, but it cannot be applied to this case. The appellants deny the agency of the appellees to the extent asserted and exercised by the latter. According to the contention of appellants, the agency of appellees was a special one, limited to the sole duty and authority of selling the business known as the Hereford Garage in bulk for cash or exchanging it for such property as appellees were willing to accept as a credit upon the indebtedness. Furthermore, the rule cannot be applied if the agent has been recreant to his trust. It is insisted by the appellants that no authority was ever vested in the appellees, or either of them, to take charge of the garage and carry it on as a retail business, selling the stock on hand, incurring indebtedness, and buying new stock. The appellees admit that this was done, and that they not only purchased new goods in the name of the Hereford Garage, but in the name of Witherspoon & Kinney as well. In deference to appellant's earnest insistence during the discussion of the motion for rehearing we have again reviewed the statement of facts with the view of ascertaining the extent of the appellee's authority. In this connection we call attention to the fact that in the original petition, upon which the first trial was based, the appellees made no declaration whatever

as to the alleged verbal contract of October 16, 1920. In the first amended original petition, upon which the case was tried the last time, the allegation with reference to that conversation is as follows:

"Plaintiffs further aver that on or about the 16th day of October, 1920, the defendants informed the plaintiffs that they would not be able to meet and discharge the note above described at its maturity on November 1st, whereupon the plaintiffs entered into a verbal agreement with the defendant W. H. Terry, acting either for himself or as the agent of J. G. and R. A. Terry, by the terms of which it was agreed that plaintiff should go into joint possession with J. G. and R. A. Terry of the business then being conducted by J. G. and R. A. Terry, and should assist in the conduct and management of the same, and that the plaintiffs would use their efforts in trying to find a purchaser for said business, and that, plaintiffs should keep the same open and a going concern for the purpose of applying the proceeds that might be obtained from the sale of said business, or from conducting the same to the payment of the note above described. It was further agreed that the plaintiffs should be paid a reasonable compensation for their services in assisting in conducting the said business.

"Plaintiffs aver that they went into immediate joint possession of said property after entering into said parol agreement, and continued to conduct the same in connection with the defendants R. A. and J. G. Terry until about November 1, 1920, when the said R. A. and J. G. Terry voluntarily abandoned the business and left the plaintiffs in sole possession and control thereof; that plaintiffs were and have continued to be active and diligent in trying to find a purchaser for said business and in disposing of said property under their agreement; that at the time of making the parol agreement above mentioned the defendants R. A. and J. G. Terry were conducting a garage and an automobile repair shop, and were handling, dealing in, and selling automobile tires, repairs, and all sorts of accessories in what was then known as the Hereford Garage, in Hereford, Deaf Smith county, Tex.; that the services of the plaintiffs while in charge of and running said business were reasonably worth the sum of $150 per month for each man so employed in connection therewith, and that two of the plaintiffs were so employed for a part of the time."

[3] We think it is clear that Witherspoon, Kinney, and Beams had no authority to conduct the business, as they have been doing since October 20th, unless such authority has been verbally conferred. Neither the deed of trust upon the land nor the first chattel mortgage which covered the tools and fixtures conferred any such authority. In the amended petition it is alleged that the bill of sale, which appellees alleged to be a chattel mortgage, and the written contract, both of which instruments were executed October 20th, vested them with such powers. We cannot assent to this proposition. The bill of sale dated October 20, 1920, and which the appellees alleged was intend-

ed as a mortgage, recites a consideration of one dollar and other good and valuable considerations, and is simply a formal bill of sale with a warranty of title executed by J. G. and R. A. Terry, conveying to the appellees the stock of merchandise located in the Renfro building on Third street in Hereford, Tex., and includes an acetylene welding outfit and burning-in stand, which it states is now in the same building and which were not mentioned in the original chattel mortgage covering tools, equipment and fixtures. The contract executed the same day, and which, according to the appellee's allegations, is a part of the same transaction, recites in part:

"Whereas, first parties are indebted to the second parties, which is evidenced by a promissory note; and whereas, for the purpose of aiding in the discharge of said indebtedness first parties have this day given second parties a bill of sale to certain personal property now located in the Renfro Building, in Hereford, Tex.: Now, therefore, it is hereby agreed that said bill of sale is not to be received in discharge of the indebtedness, nor is it to in any way affect the other securities of the said indebtedness, but it is agreed that second parties will take charge of the property named in the said bill of sale and will use their efforts in selling said property and turning same into cash or into other property which second parties are willing to accept as cash and the proceeds of said property are to be used as follows: First, the necessary expenses of the same are to be paid including reasonable pay for the services of either member of the second party who attends to same; then all above what is necessary to pay on said expenses shall be applied to reduce the said indebtedness to second parties."

If these writings are construed without referring to oral evidence it is clear that the appellees had no authority to take charge of the business and conduct it as a retail concern, as they at once proceeded to do, and have been doing since October 20th, and certainly only one member of the appellees' firm was entitled to be compensated for any services in selling out the business. The statement of facts shows that Kinney was paid a salary of about $125 a month from November, 1920, to March, 1921, and that Witherspoon and Beams have been drawing monthly salaries of from $125 to $200 per month during the whole period. The writings construed alone, and as alleged by appellees, are simply chattel mortgages, giving to the mortgagees the possession of the property temporarily and for a specific purpose. Under such conditions, if the mortgagee exercises any authority or dominion over the property inconsistent with the rights of the mortgagor, or exceeds his authority in dealing with it, it amounts to a conversion of the property, and the mortgagor may sue for his damages without tendering the amount of the debt due from him. Payne v.

Lindsley, 59 Tex. Civ. App. 545, 126 S. W. 329.

It remains to be determined whether the conversation on October 16th, four days prior to the execution of the writings, conferred the authority upon appellees to take charge of the business and conduct it as they had been doing. Vern Witherspoon upon this issue testified:

"W. H. Terry having requested Kinney and myself to come to the garage, and on this request Kinney and I went to the garage, and when we got there W. H. Terry was in the room where the parts were kept alone. When we went in W. H. Terry said, 'Boys, I am not going to be able to pay your note,' and I do not know whether he said 'when it is due' or whether he said 'the 1st of November.' He said, 'I thought I had the garage sold, and I guess the trade has fallen down,' and said that he had tried to borrow the money, but had failed to do it. And he turned to Kinney and said: 'Mr. Kinney, why can't you come up here and help us try and dispose of it? That is the only way I am going to be able to pay you.' And then it came up in the conversation about a stock company being formed. This conversation had at the garage lasted an hour or more. Then he turned to Kinney the second time in regard to coming in, and discussed that, and said, 'Now boys, I am willing to do anything to satisfy you boys until I can get this business sold, as that will be the only way I can pay you' and said he would have to sell the garage in order to pay us. * * * In that conversation W. H. Terry did say: 'Kinney, you do quite a bit of trading around here; why can't you come up here and help us dispose of it [meaning the garage]?' * * * The substance of this conversation was that W. H. Terry wanted Kinney to help him sell the garage out in bulk. * * * Before October 20, 1920, I hadn't agreed with W. H. Terry or any one else to go into the garage to either take charge of it or help to run it, and I don't believe that he ever singled me out personally at any time and asked me to go in there. In the conversation with W. H. Terry I have testified about there was nothing said about anybody giving us a bill of sale to the property, and at that time I had no thought of getting a bill of sale to it. * * *

"Q. Did he tell you in that conversation that he was willing for either you, Kinney, Geo. Beams, or G. E. Webb to go in there and take charge of the outfit? A. Well, as I remember, all that he said in regard to that while there was made in a discussion over that that two different times. During the conversation the first time was when he asked Kinney if he could not come up there and help him dispose of it, and later on in the conversation it came up again, and we talked about getting up a stock company; it came up again, but I cannot tell you just what was said. All W. H. Terry said about the stock company was, 'You could probably work up a stock company and sell the stock out and sell it out in that sort of way.'

"Q. He didn't tell you he was willing for you, Beams, Webb, or Kinney or any one of you or any member of you to come in and take charge of it at that time, did he? A. I cannot just recall that conversation; there was something in regard to that said, but I cannot tell you just how it was worded. * * *

"Q. He didn't talk like he wanted you all to go and run it? A. No; he didn't say anything about all of us. He spoke about one of us.

"Q. Didn't you state in the former trial that he never said for you to come in, but was talking to Kinney? A. He never singled me out and asked me to come in. * * * On the morning of October 19, 1920, H. B. Webb, Kinney, and I had a conversation after Roloson had drawn the contract and bill of sale, and before the Terry boys had signed them, in which we discussed fixing up the papers so they would better secure our note and create a lien on the property. Our purpose in getting these boys to sign the contract and bill of sale was to get in possession of the property and better secure the note, but we did not tell them that that was our purpose. * * * I took possession of the property under the contract and bill of sale, and have been holding possession of it under the contract and bill of sale since the contract and bill of sale were signed on the 20th day of October, 1920, down to the present time, which is the 30th day of May, 1922, and we are claiming a lien against the property under the contract and bill of sale. At the time the bill of sale was executed the contract was also executed as a part of it. * * * Kinney and I went in under the contract and bill of sale the day they were signed, and the first time I learned that W. H. Terry and the boys claimed we had no right to take possession under the bill of sale and contract was about 20 days after they was signed, and after I heard that they claimed this I still continued to hold possession and run it down to the present time. * * * After we heard that the Terrys claimed that we had no right to take possession under the bill of sale and contract we still continued to hold possession down to the present time, running the repair shop in the back and conducting a retail mercantile business by selling parts, repairs, and accessories to automobiles and other machinery in the front, and we were doing this when this case was first tried about a year ago. * * * During the entire time we have been buying goods and running a retail mercantile business, running the repair shop, taking in moneys on the repair shop and on the sale of goods. Part of the time we have been running the business in the name of the Hereford Garage, and part of the time in the name of Kinney & Witherspoon. We have commingled the goods that were on hand when we went in with those we have bought in the name of the Hereford Garage and those we have bought in the name of Kinney & Witherspoon, and it is impossible to tell goods that were on hand when we went in from those we bought in the name of the Hereford Garage and those we bought in the name of Kinney & Witherspoon apart, and the moneys we have taken in, we cannot tell what part was taken in from the repair shop and what part was taken in from the sale of merchandise. * * * The way I learned that W. H. Terry wanted to see Kinney and me at the garage, three or four days before the bill of sale and contract were signed was from Mr. Kinney. Kinney told me that W. H. Terry wanted to see us at the garage, and we went up there and had the conversation I testified about on my cross-examina-

tion. This conversation lasted about one hour. When we got there W. H. Terry just says, 'Boys, we are not going to be able to pay our note when it is due,' and said that he would not be able to pay the note until he sold the business or did something. He said, 'I thought I had the garage sold to Karl Shirley, but think the trade has fallen down.' He also said that he had tried to borrow money, but, could not do it, and at that time I believe was when he turned to Kinney and asked him about coming and helping him sell the garage. He said to Kinney, 'You are a good trader around here; why can't you come in here and help us dispose of it? That is going to be the only way we are going to be able to pay you.' I would not say whether Terry said to Kinney, 'Come in and help us run this until we sell it,' or whether he said, 'Come in here and sell it.' That isn't clear enough in my mind to state. In this conversation Terry did say, 'I am willing to do anything to satisfy you boys.' * * * In this conversation we didn't discuss any matters except the note and disposing of the garage. Nothing in this conversation was said about any mortgage or lien or anything. He told us, just made the remark, 'Why can't you boys come in here and help us straighten this business up? Guy can go in the back shop and work as a mechanic and draw his pay back there, and you boys can work up here with Roy, and that will give Roy more time to get out and collect his bills.' We were to help R. A. Terry in the front. And something was said about Kinney getting out and trying to get a buyer. * * * In the conversation Kinney and I had with Terry before he went to Clarendon, that I have testified about, in which the matter of helping to sell the property was discussed, Terry had reference to selling it as a whole."

Appellee E. W. Kinney upon this issue testified as follows:

"After Witherspoon and I went into the garage on October 20, 1920, I had nothing to do with collecting accounts the Terrys had made prior to that time, but put in my time from then until March 1, 1921, collecting accounts we made, and trying to find a purchaser for the business. More of my efforts were in trying to sell the property. I seem to find very many that were interested; I think Karl Shirley was the nearest prospect we had. W. H. Terry had told Witherspoon and I just before he went to conference at Clarendon (on October 16th) that he was on a trade with Karl Shirley, and that his trade had fallen down. I spent lots of time with him trying to sell him the property. I tried to sell it to a man by the name of Flanagan, etc., and others. I understood my duties were to sell the outfit as a whole and help run it until I sold it. I understood this from a conversation Witherspoon and I had with Terry just before he went to conference at Clarendon. The substance of that conversation was, 'Boys, I am not going to be able to meet this note, and we will either have to sell this thing or you come in and help the boys run it until I find a buyer. I have tried to find a buyer and can't.' * * * It was my understanding from this conversation that W. H. Terry wanted me to sell the business wholesale, lock, stock and barrel. I understood from this conversation with Terry that what he wanted

me to do was go in there and sell the outfit in bulk. * * * On the 19th day of October, 1920, Witherspoon, Webb, and I went to the garage and saw the boys, and asked them to sign a contract authorizing us to go in there and help him sell out the stock of goods; that is, to sell the thing in bulk, lock, stock, and barrel. * * * In substance the proposition that W. H. Terry made in the conversation Witherspoon and I had with him before he went to Clarendon was, he talked to us about going in there, and helping to sell the business. * * * We quit trying to sell the business out in bulk at the last trial of the case, which was a year ago, and have not been trying to sell it since that time. * * * We commenced claiming a lien on the garage and property in it under the bill of sale and contract the day they were executed. I don't know whether we have been holding it as a lien to secure our debt or not; we have been holding it according to the terms of the contract and bill of sale, and our intentions have been to hold it in accordance with all the provisions of the written contract dated October 20, 1920, and we have been holding it in that way for those purposes from the time the contract was written down to the present time. * * * I understood from the conversation that I testified to having with Terry before he went to Clarendon that he wanted us to run the business in a retail way until we could find a buyer because he knew his note would be due in 10 days, and he didn't have time to raise the money, and that would give him more time to raise the money, but there was nothing said about an extension of the note in the conversation, and we did not agree to extend it; neither did he ask us for more time, and our going in there didn't give him more time."

[4, 5] The Terrys flatly denied that they or either of them had ever authorized the appellees to take charge of the business and conduct it as a retail concern. Witherspoon and Kinney's statements as to what they concluded or understood from the conversation with W. H. Terry concerning the extent of their authority was not admissible, and in giving their understanding from what was said they invaded the province of the jury, and all such statements must be disregarded in determining the effect of the evidence. Shaw v. Gilmer (Tex. Civ. App.) 66 S. W. 679; Biering v. Wegner, 76 Tex. 506, 13 S. W. 537; Buzard v. McAnulty, 77 Tex. 438, 14 S. W. 138. Stripped of this incompetent testimony, we conclude that there is nothing in the evidence of either Witherspoon or Kinney which shows that they had any authority to carry on the business indefinitely or for any period of time as a retail business. Both of them say that they took possession, held it, and conducted the business under the bill of sale and contract. Their testimony shows that W. H. Terry had been trying to sell it to Karl Shirley. Failing in this, it is clear that he wanted to get Kinney, who, it seems, was a trader, to sell it in bulk, and if this could not be done then to have the appellees organize a stock company

for the purpose of buying it in bulk. Witherspoon states that prior to the execution of the written instruments Terry had not agreed for them to take charge of the business and run it, and he frankly admits that their object in having the bill of sale and contract drawn and signed by the two boys was to enable the appellees to take possession of the property for the purpose of better securing them in the payment of their debt. Kinney says he made an effort to sell it to several different parties; that there was no agreement for the extension of the time of payment beyond November 1st; and in detailing the conversation with W. H. Terry it appears that he intended for one of them to come in and take charge of the goods on hand, and which were exposed for sale in the front of the building, while one of the boys could devote his entire time to collecting unpaid bills which were due the Terrys. It is true that Kinney said: "The substance of that conversation was, 'Boys, I am not going to be able to meet this note, and we will either have to sell this thing or you come in and help the boys run it until I find a buyer. I have tried to find a buyer and can't.'" This statement, if true, contradicts the written contract, and is at variance with the remainder of Kinney's testimony, where he says he understood he was to sell the business, lock, stock, and barrel, and "Terry had reference to selling it as a whole." His efforts to sell it as a whole and his withdrawal from the conduct of the business after March 1, 1921, is inconsistent with the above quoted statement.

The most favorable construction which can be placed upon the evidence of Witherspoon and Kinney is that one of them was authorized to come into the building and help dispose of the merchandise then on hand during the 10 days intervening between the 20th of October and the maturity of the note on November 1st, and that during said time they were expected to dispose of it in bulk for cash or for such property as they would accept in lieu of cash as a credit upon their note, and that it was contemplated that this sale could be made to a stock company to be organized for that purpose to Karl Shirley, or any other prospective buyer. Aside from the "suppositions" and the "understandings" of Witherspoon and Kinney, there is nothing in the record which would authorize them to conduct the business as their testimony shows they have been doing, and, if they are to be believed, their conduct of the business is based exclusively upon the supposed authority conferred upon them by the writings, and not by reason of anything said by Terry in the conversation on October 16th.

[6] Since the written instruments referred to above show that appellees are mortgagees, in possession, with power to sell the goods described in the instruments, and that they have accepted under the authority so conferred, the question arises whether they may maintain this action for a foreclosure of their lien through the instrumentality of the court. Their amended petition alleges the execution of the written instruments giving them a lien, and further alleges verbal and written authority conferred upon them to sell the property and apply the proceeds to the payment of their debt, and that they have acted upon such authority. This being true, we strongly incline to the opinion that the general demurrer should be sustained to the petition, since a mortgagee cannot resort to both remedies of sale under the power of and foreclosure by suit at the same time. It presents a question of election between inconsistent remedies. As said by the Supreme Court in Cameron v. Hinton, 92 Tex. 492, 49 S. W. 1047:

"The allegations of the plea showed that Cameron & Co. had three remedies: (1) To sell the cattle at public outcry under the power contained in the deed of trust; (2) to sell to Raynor under the verbal authority from Hinton, and, if a valid sale had been made, to enforce it against Hinton; (3) to foreclose the mortgages by suits. These remedies were inconsistent with each other, and no two of them could be resorted to at the same time. When Cameron & Co. brought their suits to foreclose the mortgages, sequestered the property, and replevied it, they abandoned the agency created by the verbal authority from Hinton to sell it to Raynor, and thereafter their rights must be enforced under the suits for foreclosure."

So in this case it appears from the allegations in the petition that the appellees have gone into possession of the property under verbal and written authority conferred upon them by the Terrys to take charge of it and sell it and satisfy their note in that way. If this is true we seriously doubt, as against a general demurrer to the petition, their right to maintain this action to recover by suit while still holding the property under the verbal power. A creditor cannot resort to two inconsistent remedies for the collection of his debt at the same time. Ward v. Green, 88 Tex. 177, 30 S. W. 864; Avery v. Texas Loan Agency (Tex. Civ. App.), 62 S. W. 793; Moore v. Gammel, 13 Tex. 120; Openshaw v. Dean, 59 Tex. Civ. App. 498, 125 S. W. 989.

We suggest that, upon another trial, if the petition is not amended in this particular, a general demurrer should be sustained to the plaintiff's cause of action, and that the case proceed to trial upon the appellant's cross-action.

The motion for rehearing is overruled.

BOYCE, J. (dissenting in part). I agree that the motion for rehearing should be overruled, but I cannot agree to the conclusions announced by the majority as to the necessary meaning of the contract under which

plaintiffs went into possession of the garage property and as to their right to bring this suit on their notes and have a foreclosure of their lien through a judgment of the court. It is my opinion that under the pleading and the evidence the meaning of the contract would be one of fact for the jury, and that the record would sustain a finding that the parties intended by such contract to provide that the plaintiff should keep the business "going" pending a sale. The written contract is not clear; the provision that Witherspoon and associates "will take charge of the property and use their efforts in selling it," and that out of the proceeds "the necessary expenses of the same are to be paid, including reasonable pay for the services of either member of the second part (plaintiffs) who attend to same," is not inconsistent with the idea that pending the sale the business is to be kept running. To my mind the writing itself suggests that this was what the parties intended. In cases where a written contract is ambiguous in its terms parol evidence as to prior negotiations may be introduced for the purposes of ascertaining the meaning of the writing itself. Lemp v. Armengol, 86 Tex. 690, 26 S. W. 941; Q. A. & P. Ry. Co. v. Cooper (Tex. Civ. App.) 236 S. W. 812, 813, writ of error refused 240 S. W. xxi. In some cases where the contract is altogether silent as to some of the terms of the agreement, parol evidence thereof is admissible. Wilson v. Enfield (Tex. Civ. App.) 249 S. W. 532 (1, 2), and authorities. The parol evidence as to the negotiations leading up to the execution of the contract warrants, in my opinion, the finding that it was the intention of the parties to keep the business going until it was sold in bulk. The sale of particular articles of stock and purchases in replacement thereof would not destroy the identity of the property. Byrne v. McGrath, 130 Cal. 316, 62 Pac. 559, 80 Am. St. Rep. 127. According to plaintiff's evidence, as I understand it, the proposition discussed contemplated that the plaintiffs, or one of them, should "come in" with the owners, Terry Bros.; that one of the Terrys would work in the repair shop and the other "stay in front" and assist plaintiffs in running the business. The evidence, it seems to me, would warrant a finding that it was intended that sale should be made of a "going con-cern" rather than a "closed business." The record discloses that this was the practical construction put on the contract by the parties themselves. One of the Terrys did "stay in" for some 20 days after the plaintiffs "took charge," during which time the business was kept going in the usual way. When the Terrys did go out of it was not under claim that the contract did not mean that the business should be kept going until it was sold, but under claim that the contract under which plaintiff went into possession was procured by fraud. As I understand the records in these two appeals, the Terrys have never contended until that claim was put forward in the argument on this motion for rehearing that the contract meant that the business was to be closed up pending a sale.

I do not mean to say that under the contract as plaintiffs construe it they could conduct the business indefinitely. The law would perhaps imply that a sale should be made within a reasonable time. It may be possible, too, that the filing of the suit might affect plaintiff's right to thereafter continue the business. Since questions such as these are not briefed, and they are not discussed in the majority opinion, I express no opinion thereon myself.

I question whether, under the facts of this case, there was ever a time when the doctrine of election of remedies had any application. The taking possession of the property was not in pursuance to any optional right conferred by the contract. Such act was contemporaneous with the execution of the contract, and plaintiffs expressly agreed thereby to "take charge of the property and use their efforts to sell it." In any event, in my opinion, subsequent acts of the Terrys would prevent the application of the doctrine here. Election is applied as a branch of the law as estoppel. Lewis v. Powell (Tex. Civ. App.) 205 S. W. 737. The Terrys' repudiation of the contract just before suit was filed and their reassertion thereof in this suit practically put it out of the power of the plaintiffs to sell the property (who would buy it under such conditions?) and drove the plaintiffs into court. They are not in position, under the circumstances, to invoke estoppel against plaintiffs seeking the aid of the court.