**Bert ASHBY, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 14999.**

Court of Civil Appeals of Texas. Dallas.

Oct. 7, 1955.

Hughes & Hughes, Harvey C. Ford, and Charles W. Tessmer, Dallas, for appellant.

Shields & Whittington, Dallas, and Earl P. Hall, Austin, for appellee.

Charles W. Tessmer, Dallas, et al., amici curiae.

DIXON, Chief Justice.

This is a civil suit in the nature of a disbarment proceeding brought under the authority of Article XII of the Rules governing The State Bar of Texas, published immediately following Art. 320a-1, V.A.C.S.

A jury found that appellant (1) had knowingly made a false affidavit in an injunction suit styled E. L. Davis v. Bill Decker, Sheriff, when he swore that the signature of Robert Louis Smith, principal on a bail bond, was a forgery, whereas in truth and fact said signature was not a forgery; and (2) had known when certain articles of jewelry came into his possession that said articles were stolen property. The trial court concluded that the facts so found constituted professional misconduct under Art. XII, § 8 of the Rules of the State Bar of Texas, and rendered a judgment revoking appellant's license, withdrawing from him all rights and privileges as a licensed attorney, and disbarring him from the practice of law.

Appellant asserts that there was no evidence to support the submission of issues to the jury, and no evidence to support the court's judgment. Therefore we must examine the evidence carefully.

Evidence Relative to False Affidavit

Many of the facts are undisputed. E. L. Davis, appellant's client, as surety had signed a $1,000 bail bond for one Robert Louis Smith, principal, charged with burglary. Smith failed to appear for trial and is a fugitive from justice. The bond was forfeited, judgment taken against the surety E. L. Davis, execution issued, levy made on real property belonging to Davis, and a sheriff's sale set for March 4, 1954. Two days before the date set for the sale appellant as attorney for Davis, filed an injunction suit and obtained an order restraining the sheriff from proceeding with the sale.

The petition in the injunction suit included this allegation: "Plaintiff says that the judgment rendered as above stated is void, for the reason that said bond was not signed by the alleged principal, Robert Louis Smith, but on the contrary the signature of the said Robert Louis Smith was forged to said bond by some person unknown to this plaintiff."

The petition also included this affidavit executed by appellant: "I, Bert Ashby, Attorney for Plaintiff in the above cause do solemnly swear that the matters stated in the foregoing petition are true. Bert Ashby. Sworn to and subscribed before me this the 2nd day of March, A.D. 1954. Claude Self, Notary Public, Dallas County, Texas."

There is much evidence in the record to support the jury finding that the signature of Robert Louis Smith was not a forgery. Appellant does not attack said finding, so we shall not discuss it. However appellant does attack the jury's finding that he, appellant, when he swore that the signature was a forgery, knew that his affidavit was false. Therefore we must study the record to determine whether there is any evidence to support the latter finding.

Part of the evidence offered by the State is the testimony of two newspaper reporters, who together interviewed appellant a short time after he filed the injunction petition. We here reproduce a portion of the testimony on direct examination of Stewart Doss, one of the reporters: "Well, after I had asked him about the petition we just engaged in general conversation there and

he said his purpose in filing the suit was to stall for time to give his client E. L. Davis time to raise the money to pay off this bond * * * he said Davis, as I recall it, the poor guy Davis was over a barrel, he said 'Really, my only purpose is to give him time so he can raise the money so he can pay off,' and then he also said something—in his petition he had alleged the signature of Robert Louis Smith was a forgery and that he had to think of something and put that in. * * * he said he had alleged forgery because he had to think of something to put in his petition." On cross-examination this witness testified as follows: "Q. Well, the point is this— which is a very material point—didn't Mr. Davis say—I mean Mr. Ashby say that he relied on the representations of Mr. Davis, so far as he personally was concerned he didn't know whether Mr. Davis knew it was a forgery or not but he filed it on the statement of Mr. Davis that it was a forgery, the principal? A. Sir, I don't recall any statement so phrased. Q. Well, that was just about the substance of it, wasn't it, Mr. Doss? A. Well, I don't remember any reference to what Davis himself had told Mr. Ashby."

We also reproduce a portion of the testimony on direct examination of Ben Bradford, the other reporter: "Q. All right, will you tell the jury what was said in that conversation—what you heard? A. Well, generally, Stewart asked him about the case in general and Bert told him he had to figure up some way of stalling for time so that his client wouldn't lose this piece of property or pieces of property through a forced sale—if he had more time he could probably save his property and as I recall he said—I believe Stewart asked him if he had any intention of winning the suit and Bert replied that he didn't have any intention of winning, that he was just trying to get some additional time." On cross-examination this witness testified as follows: "And did he tell you that Mr. Davis had told him it was a forgery and he relied on it and didn't know whether it was or not? A. No, sir, he didn't tell me that. Q. Was that the substance of the conver-sation? A. No, sir, I don't believe that part—no, sir, I don't believe that, no, sir."

Appellant denied that he made the statements attributed to him by the reporters. His testimony was that he told the reporters that he made the affidavit because his client told him Smith's signature was a forgery.

### Evidence Relative to Stolen Property

On February 23, 1951 someone broke a show window of Linz Bros., Jewelers, and stole nine rings and twelve watches. For identification purposes the rings had been marked with small scratch numbers; the watches bore movement numbers.

Tom Floyd, a witness offered by the State, testified that in 1951 he operated two businesses: a sanatorium for alcoholics at 2345 Reagan Street, and a bail bond business. He had formerly had business dealings with appellant in connection with both enterprises, having had him as a patient in his sanatorium, and also having executed bail bonds in blank, which appellant Ashby used as he pleased. Among bail bonds he made were several for a burglar named Kenneth Wells.

Floyd further testified that on February 26th following the Linz Bros. theft, he was called from his sanatorium to appellant's office where he conferred with appellant and his wife, now Mrs. Mabel Carpenter, in regard to money owed to Floyd by appellant. In one of his filing cases appellant had a number of rings and watches which still had price tags attached to them. Appellant explained that this jewelry belonged to a client who owed him an amount of money. As the amount owed was somewhat less than the value of the jewelry, appellant was not free to turn the jewelry over to Floyd. The client was summoned and arrived at appellant's office accompanied by another man. The jewelry was then sold to appellant for a consideration of $400 plus cancellation of the client's debt to appellant. Floyd furnished $300 of the cash. The jewelry was then divided between appellant and Floyd, the latter receiving a number of watches to hold as security for the debt

owed him by appellant. Floyd took the watches to his home on Reagan Street where he hid them under some shirts in a dresser drawer. About a year later police with a search warrant searched Floyd's premises on Reagan Street, but failed to find the watches. However sometime thereafter upon demand by the police, Floyd directed the police to go to his home on Reagan Street with Floyd's attorney, not appellant, and the watches were handed over to the police. They were identified as part of the jewelry stolen from Linz Bros.

On cross-examination by appellant's attorney, Floyd testified that when he made a deposition in the District Attorney's office, and was shown a picture of Kenneth Wells, he found out that Kenneth Wells had burglarized Linz Bros. by throwing a brick through the window.

Meantime some rings and a watch were found in the possession of two pawnbrokers. The rings were found June 11, 1951 in possession of Johnny Clingingsmith, who testified that they had been pawned by appellant and his wife. The watch, as shown by the pawn ticket, was pawned by appellant June 20, 1951 with Sam Kassed. This jewelry was also identified as part of the jewelry stolen from Linz Bros.

T. B. Leonard, a police lieutenant, testified that he and another officer, Captain Stephenson, talked to appellant Ashby on June 14, 1951 about the rings pawned with Clingingsmith and identified as stolen in the Linz Bros. burglary. Appellant told the officers he got the rings from Kenneth Wells. At the time of this interview the officers had a description of the articles taken in the Linz Bros. burglary, and asked appellant if he had any of those particular items. Appellant replied that he did not. However only six days later, June 20, 1951, appellant pawned one of the Linz Bros. watches with Sam Kassed, the date being shown on the pawn ticket. Lieutenant Leonard also testified that in February 1952 he and another officer had recovered four watches and a diamond ring from Tom Floyd at his home on Reagan Street. This

jewelry was also part of the Linz Bros. burglary loot.

Appellant Ashby testified that he had been a licensed practicing attorney since 1925. In 1950 through Tom Floyd he had met Kenneth Wells, who had come to his office a number of times. He represented Wells on several occasions and in every instance Floyd had made a bail bond for Wells. Appellant denied that on February 26, 1951 he had turned over a number of watches to Tom Floyd. On March 14, 1951 he had received a ring and a wedding band from Kenneth Wells. About sixty days later he had received a watch from Wells. His wife had pawned two rings with Clingingsmith and he had pawned a watch with Sam Kassed. He said he did not know the jewelry was stolen property.

Appellant testified that he had formerly been an assistant district attorney, had tried "hot" jewelry cases and knew that the police inspected pawn shops in their search for stolen property. Therefore, if he had known the watch was "hot," would he have walked down to Sam Kassed's with it? He denied that he was drunk at the time, or that he had been drinking. He had never been to Tom Floyd's home on Reagan Street, but he had been out there at the Sanatorium as a patient.

Appellant's first point on appeal is that the trial court's judgment is not supported by the evidence; his second point is that the court erred in submitting any issues to the jury regarding the false affidavit, because he filed the injunction suit in good faith believing he had a right to do so in accordance with Rule 14 T.R.C.P. based on representations made to him by his client E. L. Davis; and his third point is that the court erred in submitting issue No. 5 to the jury because said issue was not supported by any evidence, in that no witness testified that the defendant knew that the articles of jewelry had been stolen.

 A person's knowledge or intent, being a state of mind, is a fact which is often difficult and at times impossible to prove by direct testimony. But it is not a fact which is incapable of proof. The law rec-

ognizes the difficulty and permits the presence or absence of a certain state of mind to be established by proof of circumstances. Blanton v. Sherman Compress Co., Tex.Civ. App., 256 S.W.2d 884; Smith v. Jungkind, Tex.Civ.App., 252 S.W.2d 596 (Ref.); Dallas Joint Stock Land Bank v. Lancaster, Tex.Civ.App., 91 S.W.2d 890; Corrigan v. Shell Petroleum Corp., Tex.Civ.App., 62 S.W.2d 663; Peerless Oil & Gas Co. v. Teas, Tex.Civ.App., 138 S.W.2d 637; 17 Tex.Jur. 408–409. In 20 Am.Jur. 320, it is said: "Whenever issues of * * * fraud, and good faith are raised, the evidence must take a rather wide range and may embrace all the facts and circumstances which go to make up the transaction, disclose its true character, explain the acts of the parties, and throw light on their objects and intentions."

■ Measuring the testimony in the record before us by the rule as above stated we are unable to agree with appellant that the judgment in this case is not supported by evidence, or that there is no evidence to support the submission of issues to the jury. Certainly Rule 14 T.R.C.P. does not authorize an attorney knowingly to make a false affidavit, or to make affidavits with a reckless disregard for the truth; nor does it grant immunity to any attorney who does so. We overrule appellant's first, second and third points.

In his fourth, fifth, ninth and tenth points appellant asserts error in allowing appellee's attorney to elicit testimony as to appellant's excessive drinking and his visits to Tom Floyd's sanatorium on Reagan Street to sober up. Part of this testimony was for the obvious purpose of challenging appellant's statement that he had never been to Tom Floyd's home on Reagan Street. Part of it was for the purpose of rebutting appellant's testimony that since he was a former assistant district attorney and knew the police checked pawn shops, he would hardly have taken the watch to Sam Kassed's to pawn it on June 20, 1954 if he had known it was stolen property. Appellee's attorney sought to rebut appellant's statement by showing that when the acts of misconduct were alleged to have been committed, appellant was intoxicated and therefore disposed to commit acts which might ordinarily have been guardedly avoided by him. Under the particular circumstances of this case we do not think that it was error to admit the evidence. In one instance appellant himself brushed aside his attorney's objection and insisted on testifying that he was not drunk when he pawned the watch with Sam Kassed. In another instance, that mentioned in appellant's fifth point, the trial court sustained appellant's objection. Anyway in view of Rule 434 T.R.C.P. we do not consider that the admission of the evidence complained about constituted reversible error. We overrule appellant's fourth, fifth, ninth and tenth points.

In his seventh point appellant complains that appellee's attorney was permitted to ask Mrs. Mabel Carpenter, appellant's former wife, whether she tried to pawn jewelry in Tacoma, Washington. The witness replied that she did not try to, she actually did pawn jewelry in Tacoma. According to the record before us no objection was made to this testimony. Appellant's seventh point is overruled.

The record discloses that when appellee asked the witness, Mrs. Mabel Carpenter, about her complaints concerning appellant to the police department, objection was immediately made and sustained. The witness did not answer the question. We overrule that part of appellant's eighth point pertaining to this incident.

A part of the proceedings which took place during appellee's cross-examination of Mrs. Carpenter is here reproduced:

"Q. Your testimony is that you never gave any of Bert's ledgers or pages to anyone else other than to Bert or your brother-in-law? * * * A. No.

"Q. OK. Do you know Mr. Henry Wade? A. Yes, I do.

"Q. Have you ever talked to him? A. On several occasions.

"Q. Talked to him about Bert? A. Yes.

"Q. You took one of Bert's ledgers up there to him, didn't you? A. I did not take anything to Henry Wade. * * *

"Mr. Hughes: We object to it as irrelevant and immaterial. If it has any materiality we have no objection to bringing it in and letting this jury see it. That is my objection.

"The Court: What is the materiality of it?

"Mr. Shields: If Your Honor please, I want to show that this witness is entirely unreliable; that she has lived with Bert and then she goes and complains about him—

"Mr. Hughes: Now, Your Honor, that is a domestic affair—

"The Court: Let him make his objection.

"Mr. Shields: That there is not anything that she says here can this jury rely upon under those conditions. That is why I asked her about it.

"Mr. Hughes: It may be that his ex-wife and him have had some fusses like lots of people have, and we ask the Court to instruct the jury not to consider the remarks that she is unreliable any more than the thief they brought down here that had that bunch of watches is unreliable.

"Mr. Shields: It is all right for him to say it but not for me.

"The Court: Mr. Hughes, I have already instructed the jury what you lawyers say is not evidence in this case. I think they understand that.

"Mr. Hughes: Well, we object to any and all testimony—of course, they have been married twice and divorced twice and of course they have had some fusses and we say that has got nothing to do with this case.

"The Court: If you offer the testimony for impeachment purposes and lay a proper predicate for it I will consider it; otherwise, the objection will be sustained.

"Mr. Shields: All right, Your Honor."

In his sixth and eighth points appellant complains because appellee sought to show, as above indicated, that Mrs. Carpenter took some of appellant's records to the District Attorney's office; and also because of appellee's statement that he wanted to show "that there is not anything that she says here can this jury rely upon under those conditions."

In view of the surrounding circumstances, part of which is reflected in the excerpt of the proceeding above reproduced, we are of the opinion that appellant's sixth and eighth points do not present reversible error. Said points are overruled.

■ In an amended brief appellant asserts that "the disbarment was an excessive judgment on the part of the trial court based on the facts adduced at the trial."

Art. XII, § 28, of the Rules of the State Bar of Texas, provides that "shall find the defendant guilty, he shall determine whether the party shall be (a) reprimanded, or (b) suspended from practice (in which case he shall fix the term of suspension), or (c) disbarred; and he shall enter judgment accordingly." Thus it will be seen that the trial court, within certain limits, is granted discretionary powers as to the appropriate judgment to be entered. We find nothing in the record to warrant our holding that the trial judge abused his discretion in this case. Appellant's last point is overruled.

The judgment of the trial court is affirmed.