Lavina ROGERS, et al., Appellants,

v.

RICANE ENTERPRISES, INC., et al., Appellees.

No. 07–91–0058–CV.

Court of Appeals of Texas, Amarillo.

July 24, 1996.

Opinion Granting Appellees' Motion for Rehearing and Overruling Other Motions for Rehearing Sept. 18, 1996.

Rehearing Overruled Oct. 8, 1996.

Law Offices of Robert P. Baxter, Jr., Robert P. Baxter, Jr., Dallas, Hook and Husen, Dan Hook and Richard Husen, Levelland, for appellant.

McCleskey, Harriger, Brazill and Graf, Dennis R. Burrows, Lubbock, Bullock, Scott, Neisig and Owens, Tom Scott, C. Medferd Owen, Jr., Midland, Tabor and Tabor, Warren G. Tabor, Jr., Levelland, Brockett and Lindemood, C.H. Hal Brockett, Jr., Midland, Amoco Production Co., A. Andrew Gallo, Carolyn J. McKinney, Houston, Patton, Boggs and Blow, Pat Long, Dallas, Shafer, Davis, Ashley, O'Leary and Stoker, Robert E. Motsenbocker, Odessa, Underwood, Wilson, Berry, Stein and Johnson, Edward H. Hill, Amarillo, Whitten and Young, Charles

C. Self, III, Abilene, Hughes and Luce, Walter G. Pettey, III, Stephen G. Gleboff, Dallas, Carr, Fouts, Hunt and Wolfe, Donald M. Hunt, Lubbock, for appellees.

Before BOYD and QUINN, JJ. and REYNOLDS, Senior Justice.*

## ON REMAND FROM THE SUPREME COURT

BOYD, Justice.

The controversy giving rise to this appeal has been the subject of four previously reported opinions, two by this court and two by our supreme court.[1] Even so, a brief resume of the rather tortuous and convoluted history of the case is necessary for an intelligent discussion of the matters now before us. This matter originated as an action in trespass to try title and for conversion. It was filed on April 2, 1984, by appellants[2] (the Rogers Group), claiming as shareholders of defunct Western Drilling Company (Western), and through various amended petitions included as defendants: Richard Scurlock (Scurlock), individually, and Ricane Enterprises, Inc. (Ricane); Brock Resources, Inc. (formerly Argonaut Energy Corporation) (Brock); Willbros Energy Services Company (formerly Cordova Resources, Inc.) (Willbros); Amoco Production Company (Amoco); Pride Pipeline Company (Pride); Mobil Oil Company (Mobil); Lea Refining Company (formerly Southern Union Refining Company) (Lea); Southern Union Company (Southern Union); Meyer, Moritz & Company, Inc. (Meyer–Moritz); Jerry Moritz (Moritz), individually; Torreyana Oil Corporation (Torreyana); Opeco Energy, Inc. (Opeco); Tom Meredith (Meredith); J.C. Craft (Craft); Calvin J. Ortego (doing business as Tego) (Ortego); Patrick L. Helton (Helton); and Allen Harrison (Harrison).

In their action, the Rogers Group sued appellees to recover possession of a working mineral interest under an assignment of an oil and gas leasehold estate, insofar as it covers a 329.3 acre tract out of approximately 7,893 acres in the base lease. The Rogers Group also claimed entitlement to all rights formerly held by Western under a conveyance of mineral interest and further claimed that appellees, under a claim of title adverse to them, had converted production from the 329.3 acre tract of land.

On May 31, 1937, Carrie Slaughter Dean, as lessor, entered into an oil and gas lease with lessee P.N. Wiggins covering approximately 7,893 acres. The lease contained a habendum clause providing that Wiggins was "TO HAVE AND TO HOLD [the 7,893 acres] ... for a term of ten (10) years from [May 31, 1937] ... the primary term, and as long as oil and gas ... is produced...." The lease also provided that if the leased premises "shall hereafter be owned in the severalty or in separate tracts, the premises, nevertheless shall be developed ... as one lease...." The lessee achieved production within the primary term, which production apparently continues to this time, and subsequently assigned the base lease to Superior Oil Company (Superior).

Subsequently, on June 1, 1949, Superior assigned the lease above a depth of 5200 feet on 329.3 acres of the larger tract, on which there was no production, to Western. In the assignment, it was provided the conveyance would terminate and the property revert to Superior unless Western commenced drilling within thirty days. Western also agreed to assume all express and implied base obligations. Western immediately drilled and completed one well. The well was marginally productive and ceased production in July,

---

* Charles L. Reynolds, Chief Justice (Ret.), Seventh Court of Appeals, sitting by assignment. Tex. Gov't Code Ann. § 75.002(a)(1) (Vernon Supp. 1996).

1. *Rogers v. Ricane Enterprises, Inc.*, 775 S.W.2d 391 (Tex.App.—Amarillo 1987); *Rogers v. Ricane Enterprises, Inc.*, 852 S.W.2d 751 (Tex.App.—Amarillo 1993); *Rogers v. Ricane Enterprises, Inc.*, 772 S.W.2d 76 (Tex.1989) (*Ricane I*); and *Rogers v. Ricane Enterprises, Inc.*, 884 S.W.2d 763 (Tex.1994) (Ricane II).

2. Appellants, suing as shareholders and as successors in interest of the disenfranchised Western Drilling Company, Inc., are Lavina Rogers; K.W. Cecil, Jr.; E.W. Cecil, individually and as Independent Executor of the Estate of Michael Cecil, deceased; Linda K. Cecil Edwards; Norma Jean Rogers Choate; Jean Campbell Rogers; and Robert Richard Rogers.

1961. Western and its shareholders did nothing on the tract from 1961 until the present time.

In August 1960, before the marginal well ceased production, Western's president, E.P. Campbell, signing in his individual capacity, conveyed all his "right, title, and interest" to the 329.3 acre tract to the Dakota Company, Inc. (Dakota). In return, Dakota gave Campbell a promissory note and deed of trust which Campbell transferred to Union Bancredit Corporation. Union Bancredit purported to foreclose on the 329.3 acres when Dakota defaulted on the note. Union Bancredit subsequently assigned the 329.3 acres to Harry Allred, a majority shareholder of the Torreyana Oil Corporation. Torreyana, a part of the Ricane Group, successfully drilled four new wells on the premises in 1979.[3]

Campbell died in 1961, and in 1965 the State of Texas forfeited Western's corporate charter due to nonpayment of franchise taxes. In 1984, as we have noted, the Rogers Group brought this action in trespass to try title against appellees, seeking to quiet their title to the working interest under the partial assignment of the base lease. They alleged that the drilling of the well by Western within the required time fulfilled Western's obligation under the assignment, the assignment continued in force and, as the successors in interest to, or the beneficial owners of the claims, assets and properties of Western, they were entitled to the recovery sought.

The Rogers Group also alleged that between 1979 and 1983, Harry Allred, "sole owner" of Torreyana, executed assignments to "Scurlock and/or Ricane, Opeco and/or Meredith, Torreyana, Ortego and Craft." They also alleged that on or about March 6, 1983, Torreyana purported to transfer "an interest" in the premises to Meyer–Moritz and that Meyer–Moritz later conveyed interests to Argonaut and Cordova. They additionally alleged that Ricane and/or Scurlock claimed an overriding royalty interest, that Mobil purchased oil and assorted hydrocar-

bons from the property "on or about October of 1979, through and including approximately all of 1980," that Southern Union purchased such production "for approximately the years 1981, 1982, and through February or March of 1983," that Pride purchased such production from "approximately February or March of 1983, to and through the filing of this lawsuit until appointment of the receiver," and that Amoco purchased "all gas, casinghead gas and associated hydrocarbons from the Leased property from approximately October of 1979 to the current time." The Rogers Group sought recovery of damages for conversion of oil and casinghead gas, for bad faith trespass, and for punitive damages.

In delivering the case to the jury, the trial judge submitted eighteen questions. In response to the questions, the jury: 1) & 2) found Western Drilling at all relevant times owned a 1/3 working interest in the property; 3) found Ortego, Craft, Ricane, and Cordova/Willbros at various times owned interests in the subject property; 4) failed to find that Cordova/Willbros trespassed upon the property in bad faith; 5) failed to find Amoco, Southern Union, Pride, Mobil, Ricane, or Cordova/Willbros converted oil and gas produced from the subject property; 6) refused to assess exemplary damages against Mobil, Southern Union, Pride, Meyer–Moritz, and Allen Harrison, but did assess such damages in the amount of $30,000 against Pat Helton, and amounts of $125,000 each against defendants Torreyana, Opeco/Meredith, and Cordova/Willbros; 7) found the Rogers Group discovered or should have discovered the operations being conducted by the defendants by January 1, 1980; 8) refused to award the Rogers Group attorney fees against Meyer–Moritz, Pat Helton, Allen Harrison, Torreyana, Opeco/Meredith or Cordova/Willbros; 9) found Western abandoned or ceased operating the leased premises; 10) found Superior elected to require Western to reassign to it Western's interest in the 1949 assignment from Superior; 11) found Western abandoned the purposes for which the 1969 assignment from Superior was made; 12) re-

---

3. In 1983, Harry Allred assigned his interest to Meyer–Moritz & Company. Meyer–Moritz sold part of its interest to Argonaut Energy (Now Brock Resources, Inc.) and the remainder to Cordova Resources, Inc. (now Willbros Energy Services Co.), both of which are part of the Ricane group as well.

fused to find it was more reasonable than not that there was a lost deed from Western to E.P. Campbell; 13) refused to find that Cordova/Willbros incurred reasonable or necessary expenses for improving or operating the subject property; 14) found that Western, either by passive acquiescence or affirmative action ratified the E.P. Campbell assignment to the Dakota Company; 15) found the heirs of E.P. Campbell are estopped to claim title to the land E.P. Campbell purported to assign to the Dakota Company; 16) found that Western was the alter ego of E.P. Campbell; 17) found that Southern Union, Mobil, Amoco, and Pride were good faith purchasers of the "production in question"; and 18) found the Rogers Group was not precluded by laches from asserting title to the Dean lease.

In *Rogers v. Ricane Enterprises, Inc.,* 884 S.W.2d 763 (Tex.1994) (*Ricane II*), a divided court reversed this court's affirmance of the trial court's take-nothing judgment on the Rogers Group's action in *Rogers v. Ricane Enterprises, Inc.,* 852 S.W.2d 751 (Tex. App.—Amarillo 1993, writ granted), specifically concluding "we ... render judgment quieting title in Rogers" and remanded the cause to us "for consideration of the points it (the Court of Appeals) did not reach, including the conversion issues." *Ricane II,* 884 S.W.2d at 770.

In performing our review function, we note the Rogers Group correctly postulates that by its decision, a five justice majority of the supreme court has determined that the Rogers Group had title during the times relevant to this appeal. Parenthetically, in the course of its opinion, the majority pointed out that the recitations in Campbell's deed constituted "the essence of a quitclaim deed," and, "[h]aving no title to the property interest in question, Campbell passed no title." *Ricane II,* 884 S.W.2d at 769.

Bottomed on their premise of title, the Rogers Group asks us to 1) reverse the judgment of the trial court; 2) render judgment for them for title to the subject property; 3) render judgment for the Rogers Group for conversion in amounts set out by it in Rogers' post-supreme court decision supplemental brief, including prejudgment and post-judgment interest; 4) render judg-ment that all the "operating" defendants are bad faith trespassers as a matter of law and "affirm the jury verdict insofar as it finds Cordova/Willbros, Helton, et al., are bad faith trespassers, and not entitled to any reimbursement for expenses resulting from Defendants' trespassing operations on the subject property"; 5) render judgment that the 40–acre "Initial Wellsite Tract" is still within the 1949 Superior Oil Assignment, is owned by the Rogers Group, and has not terminated and reverted to the lessors in the base lease; 6) render judgment that all appellants are shareholders/representatives of Western or, alternatively, reverse the trial court finding that the "Cecil Appellants" are not shareholders and "render that at least some of the Appellants are representatives, and that it is therefore unnecessary to decide the issue of whether the Cecil heirs are."

Further, the Rogers Group requests 7) that we remand the issue of their reasonable attorneys' fees "against the pertinent Defendants, with instructions to consider the improperly excluded evidence described above"; 8) render judgment that defendants are jointly and severally liable for all court costs; 9) reverse the directed verdicts in favor of Moritz and Scurlock and "render judgment against each of them for trespass and conversion ..."; 10) reverse the directed verdict in favor of Defendant Brock and render judgment against Brock for post-judgment trespass and conversion; 11) render judgment that Cordova/Willbros is liable for the funds paid to Cordova out of the receivership with prejudgment and post-judgment interest; 12) "remand to the trial court for consideration of consequential damages issues against the various defendants"; 13) reverse with instructions to the trial court upon retrial that certain items of evidence and testimony are admissible and certain instructions or questions "should have been given, submitted, or omitted, as the case may be...."

The Rogers Group's fourteenth request asks that we

reverse the directed verdicts on the issue of punitive damages in favor of certain Defendants, including *inter alia,* Amoco, Scurlock/Ricane et al., and render that all

defendants are guilty of gross negligence as a matter of law, or, alternatively remand that issue for new trial, and in any case remand for a new trial on the issue of the *amount* of punitive damages against each Defendant in the second phase of a bifurcated trial, and direct the trial court to admit., evidence of net worth against each defendant in the new trial, and to admit other improperly excluded evidence against the Defendants on the issue;

They go on to request that we 15) reverse the judgment insofar as based on the two-year statute of limitations against those defendants who claimed .it, and render judgment that the two-year statute of limitations does not apply to any Defendant in this case or, alternatively, reverse the judgment and disregard the jury's answer on the discovery rule (Question 7) and remand that issue for a new trial against the pertinent Defendants who claimed the statute of limitations; 16) reverse and render judgment on all the issues against the "Defaulted Defendants"; 17) remand to determine any further damages during receivership, including lost profits, deterioration of wells, plugging liability, etc., if any; and, alternatively, 18) remand for a new trial on "the issues or elements of Appellants' case not conclusively established by the evidence or answered favorably by the jury."

 Conversion is classically defined as the unauthorized and wrongful assumption and exercise of dominion and control over the property of another, to the exclusion of or inconsistent with the owner's rights. *Waisath v. Lack's Stores, Inc.*, 474 S.W.2d 444, 445 (Tex.1971). It is unnecessary to a conversion that there be a manual taking of the property. *First State Bank Morton v. Chesshir*, 634 S.W.2d 742, 745 (Tex.App.—Amarillo 1982, writ ref'd n.r.e.). In our discussion, we must bear in mind the established rules concerning conversion, and also keep in mind that a majority of the supreme court has settled title at all relevant times in the Rogers Group. Thus, to the extent the record establishes that appellees have asserted title to the property interest at issue and have, without authority from the Rogers Group, either conveyed, produced or purchased oil, gas and associated hydrocarbons, they, by virtue of the supreme court decision, absent some particular exception, have converted the oil, gas or hydrocarbons produced or purchased from the premises. It is in the light of that necessary implication that we discuss the questions remaining in this appeal.

 The question next presented is: What statute of limitations, if any, is applicable to the Rogers Group's conversion action? Although oil and gas beneath the surface of the land are considered part of the realty, once removed from the land they become personalty. *Humble Oil & Refining Co. v. West*, 508 S.W.2d 812, 817 (Tex.1974), *cert. denied*, 434 U.S. 875, 98 S.Ct. 224, 54 L.Ed.2d 154 (1977), ("once severed from the realty, gas and oil, like other minerals, become personal property"); *W.B. Johnson Drilling Co. v. Lacy*, 336 S.W.2d 230, 233 (Tex.Civ.App.— Eastland 1960, no writ) (a conversion of the sale of the proceeds of oil, gas, or a conversion of the oil itself after it was produced and severed from the land would be a conversion of personal property, not a conversion of realty).

That being true, the Rogers Group's conversion claims are for conversion of personal property and, absent some limited exceptions, such claims are governed by Tex. Civ. Prac. & Rem. Code Ann. § 16.003(a) (formerly Tex. Rev. Civ. Stat. Ann. art. 5526). *See Cherokee Water Co. v. Advance Oil & Gas Co.*, 843 S.W.2d 132 (Tex.App.—Texarkana 1992, writ denied). That statute provides, with certain enumerated exceptions not applicable here, that:

[A] person must bring suit for trespass for injury to the estate or to the property of another, conversion of personal property, taking or detaining the personal property of another, personal injury, forcible entry and detainer, and forcible detainer not later than two years after the day the cause of action accrues.

Tex. Civ. Prac. & Rem. Code Ann. § 16.003(a) (Vernon Supp. 1996). Thus, central to our discussion of this statute and its effect upon the Rogers Group's cause of action is a determination as to when their conversion cause of action "accrued" within the purview of the statute.

The primary purpose of § 16.003, as with all limitation statutes, is to compel the exercise of a right of action within a reasonable time so the opposing party has a fair opportunity to defend while witnesses are available. *Moreno v. Sterling Drug, Inc.*, 787 S.W.2d 348, 351 (Tex.1990). Such statutes are not directed to the merits of any particular case; they are a result of a legislative assessment of the merits of cases in general. *Robinson v. Weaver*, 550 S.W.2d 18, 20 (Tex.1977).

When the legislature employs the term "accrues" without an accompanying definition, the courts must determine when a cause of action "accrues" and, thus, when the statute of limitations commences to run. That question, *i.e.*, when a cause of action accrues, is a judicial one to be determined "with due regard to the underlying statutory policy of repose, without, however, permitting unnecessary individual injustices." *Moreno*, 787 S.W.2d at 351, *citing Fernandi v. Strully*, 35 N.J. 434, 173 A.2d 277, 285 (1961).

A right or cause of action does not exist until facts exist which authorize the person asserting the claim to seek relief from the person or entity due to make reparation in a court of competent jurisdiction. It involves both the existence of the right and facts sufficient to constitute such a right of action. *Williams v. Pure Oil Co.*, 124 Tex. 341, 78 S.W.2d 929, 931 (1935); *Dorchester Gas Producing Co. v. Hagy*, 748 S.W.2d 474 (Tex.App.—Amarillo 1988, writ dism'd by agr.). For the purpose of application of statutes of limitation, a cause of action can generally be said to accrue when the wrongful act effects an injury, regardless of when the plaintiff learned of the injury. *Moreno*, 787 S.W.2d at 351, *citing Robinson v. Weaver*, 550 S.W.2d at 20. The traditional rule in Texas is that a cause of action accrues and the two-year limitations period begins to run as soon as the owner suffers some injury, regardless of when the injury becomes discoverable. *Computer Associates International, Inc. v. Altai, Inc.*, 918 S.W.2d 453 (Tex.1996). Thus, in conversion cases, the general rule is that limitations begin to run at the time of the unlawful taking. *Republic Supply Co. v. French Oil Co.*, 392 S.W.2d 462, 464–65 (Tex.Civ.App.—El Paso 1965, no writ). However, if the original possession is not unlawful, the limitation period does not begin to run until the return of the property has been demanded and refused, or until the person in possession has unequivocally exercised acts of domination over the property inconsistent with the claims of the owner or the person entitled to possession. *Pierson v. GFH Financial Services Corp.*, 829 S.W.2d 311, 314 (Tex.App.—Austin 1992, no writ).

In this case, the Rogers Group argues that the initial taking was unlawful and the supreme court decision lends credence to that argument. Even so, the Rogers Group continues, by operation of the "discovery rule," the two-year limitation statute was tolled until after the final resolution of their real property title litigation. In support of that position, they rely primarily upon the decisions in *Hughes v. Mahaney & Higgins*, 821 S.W.2d 154 (Tex.1991), *citing Fields v. Austin*, 30 S.W. 386 (Tex.Civ.App.—1895, writ ref'd),[4] and *Cavitt v. Amsler*, 242 S.W. 246, 249 (Tex.Civ.App.—Austin 1922, writ dism'd). Rogers Group's reliance on those cases is misplaced as they do not support their argument.

*Mahaney* was an attorney malpractice case in which the court held that when an attorney commits malpractice in the prosecution or defense of a claim that results in litigation, the statute of limitations on the malpractice claim against the attorney is tolled until all appeals on the underlying claim are exhausted. The rationale of that decision is that in that situation, if the client was forced to pursue the malpractice claim

---

4. While Rogers suggests that the "writ refused" disposition gives that opinion the weight of a supreme court decision, that is not the case. That designation from Sept. 1, 1892 to June 14, 1927 meant only that the supreme court approved the result of the case but did not necessarily approve the reasoning used. *Brackenridge v. Cobb*, 85 Tex. 448, 21 S.W. 1034 (1893); *Fleming v. Texas Loan Agency*, 87 Tex. 238, 27 S.W. 126 (1894). The designation was also used in cases where alleged error was not properly preserved and presented to the supreme court. *See Terrell v. Middleton*, 108 Tex. 14, 17, 191 S.W. 1138 (1917).

during the litigation of the underlying claim, he would be forced to take inherently inconsistent litigation claims, *i.e.*, the client would have to defend the attorney's actions in the underlying claim while attacking them in the present proceeding. The teaching of the *Mahaney* case, and its progenitors, is that a statute of limitations is tolled for a second cause of action in instances where the viability of the second cause of action necessarily depends upon the outcome of the first case and the pursuit of the second suit prior to that outcome would either be improper or result in judicial complications. *See Walker v. Hanes*, 570 S.W.2d 534, 540 (Tex.Civ. App.—Corpus Christi 1978, writ ref'd n.r.e.); *Cavitt*, 242 S.W. at 249; *Fields v. Austin*, 30 S.W. at 387. Indeed, as the Rogers Group points out in espousing the applicability of the rule to this case, the policy underlying this concept of tolling the statute of limitations for a second or dependent cause of action is that the courts will not require a party to do a useless, burdensome, or duplicative act that ties up both litigant and court time unnecessarily, either without a chance of final resolution (until the underlying suit is resolved) or creating the possibility of conflicting results if two different suits were filed.

█ For the policy rationale to be applicable in this case, the Rogers Group would have to have been prevented from bringing their conversion action until their action to quiet title was terminated, or there would have to have been complications such as those in the *Mahaney* case. Here, as this record reveals, the Rogers Group could, and did, bring suit for conversion of personal property in conjunction with their trespass to try title action. Indeed, because ownership of property or a superior right to possession of the personal property at the time of conversion is material as bearing on the issue of conversion, *Terry v. Witherspoon*, 255 S.W. 471 (Tex.Civ.App.—Amarillo 1923), *aff'd*, 267 S.W. 973 (1925); *Gardner v. Jones*, 570 S.W.2d 198, 201 (Tex.Civ.App.—Houston [1st Dist.] 1978, no writ), that question is inextricably intertwined with the determination of conversion and the books are replete with

cases in which both questions are determined in a single case. *See* cases collated in West's Texas Digest 2nd, Trover & Conversion, § 16. The instant proceeding is not one in which the viability of the conversion action depended upon a prior successful outcome of the trespass to try title suit, or judicial complications such as those discussed in *Mahaney* would be presented. Thus, none of the policy arguments made by the Rogers Group are applicable here. That being so, the viability of the Rogers Group's conversion suit did not depend upon a prior successful determination of their action to determine title to real property, which might be governed by real property statutes of limitation. Therefore, with regard to the Rogers Group's conversion action, the two-year statute of limitations [5] governing actions for conversion of personalty is applicable.

█ The Rogers Group also argues that even if the two-year statute is applicable, they are entitled to the benefit of the "discovery rule" in determining its application to their conversion suit. The discovery rule represents an exception to the general rule of accrual and is judicially crafted to aid in determining when a plaintiff's cause of action accrues in a given case. *Moreno*, 787 S.W.2d at 351, *citing Weaver v. Witt*, 561 S.W.2d 792, 794 (Tex.1977). The rule provides that a statute of limitations does not run from a fixed date, but from the time a plaintiff knew or should have known of the existence of facts sufficient to constitute a cause of action. It is not really an extension of the limitation period, "but is merely a recognition that in certain situations it is difficult if not altogether impossible to discover the extension of a legal injury." *Hays v. Hall*, 488 S.W.2d 412, 413 (Tex.1972). It has been rather extensively used in medical malpractice situations. *See, e.g., Hays*, 488 S.W.2d at 413 (negligently performed vasectomy); *Gaddis v. Smith*, 417 S.W.2d 577 (Tex.1967) (foreign object left in patient's body); *Grady v. Faykus*, 530 S.W.2d 151 (Tex.Civ.App.—Corpus Christi 1975, writ ref'd n.r.e.) (excessive radiation). It has also been applied in other types of situations. *See, e.g., Bayouth v. Lion Oil Co.*, 671 S.W.2d

5. Tex. Civ. Prac. & Rem. Code Ann. § 16.003(a) (Vernon Supp. 1996).

867 (Tex.1984) (discovery rule applicable in suit seeking damages for permanent injury to land caused by salt water migration from oil leases); *Langston v. Eagle Pub. Co.*, 719 S.W.2d 612, 615 (Tex.App.—Waco 1986, writ ref'd n.r.e.) (libel action); *Gifford v. Bank of the Southwest*, 712 S.W.2d 182, 184 (Tex. App.—Houston [14th Dist.] 1986, no writ) (breach of bailment contract); *Kelley v. Rinkle*, 532 S.W.2d 947 (Tex.1976) (discovery rule applicable in case alleging libel of credit reputation); *Quinn v. Press*, 135 Tex. 60, 140 S.W.2d 438 (Tex.1940) (discovery rule applicable in case alleging fraud).

Initially, we note appellees' citation of *Trinity River Authority v. URS Consultants, Inc.*, 889 S.W.2d 259 (Tex.1994) and *Harrison v. Bass Enterprises Production Co.*, 888 S.W.2d 532 (Tex.App.—Corpus Christi 1994, no writ), as authority for the proposition that a lower court cannot apply the discovery rule to a new set of facts until it has first been applied to a similar set of facts by our supreme court. We disagree with that premise.

We do note the *Harrison* court's interpretation of *Trinity River* as standing for the proposition that "the Supreme Court of Texas must explicitly adopt the discovery rule before it is applicable to a specific cause of action." *Id.* at 538. However, we respectfully differ with that interpretation. In *Trinity River*, the plaintiff had alleged a cause of action against the designers of a sewage treatment basin wall which had collapsed. The lower courts had granted and affirmed a summary judgment because more than ten years had elapsed since the construction of the basin wall. The question before the court was the constitutionality of the statute of repose (Tex. Civ. Prac. & Rem. Code § 16.008) which barred suits against architects for design defects unless they were brought within ten years after the improvement was completed, regardless of when it was completed. *Trinity River*, 889 S.W.2d at 260. In the course of its discussion upholding the statute's constitutionality, the court emphasized "we are expressing no opinion on whether, if squarely presented

with the issue, we would adopt the discovery rule in a case such as this." *Id.* at 263. By that comment, implicitly, if not explicitly, the court recognized that for the question to be "squarely" presented to it, it would, of necessity, first have to be raised in the lower courts. Additionally, in considering whether this is a proper case for us to apply the discovery rule, we note the *Trinity River* court cited with approval its earlier statement in *Robinson v. Weaver, supra*, that "preclusion of a legal remedy alone is not enough to justify a judicial exception to the statute (of limitations)." *Trinity River*, 889 S.W.2d at 264.

In the recent case of S.V. v. R.V., 1996 WL 112206, 39 Tex.Sup.Ct.J. 386 (March 16, 1996), the court had occasion to consider the two-year statute applicable to personal injury actions as it read when the case before the court arose. That statute also provided that limitations began to run "two years after the day the cause of action accrues." [6] Although the statute in question was not the same two-year statute with which we are concerned, the court's discussion of the general principles to be applied in determining when a cause of action "accrues" within the purview of such statutes is pertinent and applicable here. The court also engaged in an instructive and cogent discussion in general of the principles to be considered in considering whether the discovery rule should be applied in a given situation.

Initially, citing *Trinity River*, and *Quinn v. Press*, 140 S.W.2d at 438, the court pointed out the general rule that a cause of action "accrues" when a wrongful act causes some legal injury, even if the fact of injury is not discovered until later. The court then engaged in an exhaustive review of instances in which it had applied the discovery rule. After doing so, the court noted that although the language in the cases might vary, "a general principle unites them." *S.V. v. R.V.*, 39 Tex.Sup.Ct.J. at 389.

In one type of case, the court explicated, those involving allegations of fraud or fraudulent concealment, "accrual is deferred because a person cannot be permitted to avoid

---

6. Cited by the Supreme Court as Act of May 17, 1985, 69th Leg., R.S., ch. 959, § 1, 1985 Tex. Gen. Laws 3242, 3252, *formerly codified* as Tex. Civ. Prac. & Rem. Code § 16.003(a).

liability for his actions by deceitfully concealing wrongdoing until limitations has run." *Id.* The other type of case, the court continued, comprises those cases in which the nature of the injury incurred is inherently undiscoverable and the evidence of injury is objectively verifiable. *Id.*

In explication of the general principles applicable to the latter type of cases, the court said:

> These two elements of inherent undiscoverability and objective verifiability balance the conflicting policies in statutes of limitations: the benefits of precluding stale or spurious claims versus the risks of precluding meritorious claims that happen to fall outside an arbitrarily set period. Restated, the general principle is this: accrual of a cause of action is deferred in cases of fraud or in which the wrongdoing is fraudulently concealed, and in discovery rule cases in which the alleged wrongful act and resulting injury were inherently undiscoverable at the time they occurred but may be objectively verified. This principle, while not expressed in every deferred accrual case, is derived from them and best defines when the exception to the legal injury rule has been and should be applied.

*Id.* at 389.

In amplification of the term "inherently undiscoverable," the court said:

> To be "inherently undiscoverable", an injury need not be absolutely impossible to discover, else suit would never be filed and the question whether to apply the discovery rule would never arise. Nor does "inherently undiscoverable" mean merely that a particular plaintiff did not discover his injury within the prescribed period of limitations; discovery of a particular injury is dependent not solely on the nature of the injury but on the circumstances in which it occurred and plaintiff's diligence as well. An injury is inherently undiscoverable if it is by nature unlikely to be discovered within the prescribed limitations period despite due diligence.

*Id.* at 390.

This case does not present a situation in which the drilling of the wells and the production of the petroleum products were fraudulently concealed. Neither is it a situation where the nature of the injury was "inherently undiscoverable." The Rogers Group is the claimant of a working mineral interest which carries with it the right to use so much of the surface area as may be necessary to develop that interest. The wells producing the oil, gas and hydrocarbons which were the subject of the conversion suit were openly located on the premises since at least 1979. The documents giving rise to the production of those mineral products were matters of public record. Evidence of production under those documents was not only available by visual inspection, but also through mandatory filings with the Texas Railroad Commission. *See, e.g., Harrison v. Bass Enterprises Production Co.,* 888 S.W.2d at 538. In sum, this record simply does not demonstrate that the conversions of which the Rogers Group complains were so inherently undiscoverable as to justify a discovery exception to the general repose rule represented by article 16.003(a). In reaching that conclusion, we have borne in mind the admonition of the supreme court in *Robinson v. Weaver,* that preclusion of a legal remedy alone is not enough to justify a judicial exception to the legislative policy represented by a statute of limitation, and that "the fact that a meritorious claim might thereby be rendered nonassertible is an unfortunate, occasional by-product of the operation of limitations." *Robinson,* 550 S.W.2d at 20. The *Robinson* court also cautioned that courts must keep in mind that the primary purpose of statutes of limitation was to prevent litigation of stale claims. *Id.*

 The Rogers Group also argues that the application of the two-year statute of limitations in this case, without application of the discovery rule, would violate the "open courts" provision of article I, section 13 of the Texas Constitution. It does not.

> The "open courts" provision is as follows: All courts shall be open, and every person for an injury done him, in his lands, goods, person or reputation, shall have remedy by due course of law.

Tex. Const. Art. I, § 13.

 The "open courts" provision has appeared unchanged in every Texas Consti-

tution and includes at least three separate guarantees: 1) courts must actually be operating and available; 2) the legislature cannot impede access to the courts through unreasonable financial barriers, and 3) meaningful remedies must be afforded "so that the legislature may not abrogate the right to assert a well-established common law cause of action unless the reason for its action outweighs the litigants' constitutional right of redress." *Trinity River,* 889 S.W.2d at 261, *citing Texas Ass'n of Business v. Texas Air Control Bd.,* 852 S.W.2d 440, 448 (Tex.1993). A litigant alleging a violation of the open courts guarantees must first show the abrogation of a cognizable common law cause of action and second, that the restriction was unreasonable or arbitrary when balanced against the purpose and basis of the statute. *Sax v. Votteler,* 648 S.W.2d 661, 666 (Tex.1983).

In *Computer Associates International, Inc. v. Altai, Inc.,* 918 S.W.2d 453 (Tex.1996), the court had occasion to consider an "open courts" challenge to § 16.003(a) in answering questions from the Federal Court of Appeals for the Second Circuit concerning the statute's application to a trade secrets case. The court's discussion of that challenge is applicable to the question before us. The court said:

> The traditional rule in Texas is that a cause of action accrues and the two-year limitations period begins to run as soon as the owner suffers some injury, regardless of when the injury becomes discoverable. *Trinity River Auth.,* 889 S.W.2d at 262. Failure to permit a discovery rule exception to this traditional rule does not abrogate a common law right. *Id.* Even assuming that section 16.003(a) is legislative action which affects a common law cause of action for purposes of "open courts" analysis, application of a two-year statute of limitations without a discovery rule exception is not unreasonable or arbitrary when balanced against the purpose of the statute. As we explained above, a significant purpose of statutes of limitations is to prevent the litigation of stale and fraudulent claims.

*Id.* at 458. Although the particular subject of the court's discussion was in the trade secrets context, the discussion was of general principles applicable here. The application of § 16.003(a) in this case, even assuming it affects the Rogers Group's common law right of action for conversion, is also not unreasonable or arbitrary when balanced against the purpose of the statute.

Having made the decision that the two-year statute of limitations [7] is applicable to the Rogers Group's conversion cause of action, we must now consider the implication of the supreme court decision quieting the Rogers Group's title and the application of § 16.003(a) to their conversion action as it applies to the various appellees who have appeared in this appeal.

## SOUTHERN UNION

Southern Union summarizes the argument it presents in its first two reply points as presenting the contention that "[A]s the purchaser of oil from a merchant, in whose larcenous possession of the oil the owner had acquiesced, Southern Union became a good faith buyer in the ordinary course of business and was not a convertor." In support of that proposition, it presents two corollaries: first, that the policy of marketability implicit within Texas Business and Commerce Code Annotated (the Code) § 2.403(b) and (c) (Vernon 1994) provides a sound legal basis to uphold the judgment; and second, the jury findings, as supported by the evidence, provide a sound factual basis to uphold the judgment.

Before we discuss these first contentions, we note that Southern Union, citing *El T. Mexican Restaurants, Inc. v. Bacon,* 921 S.W.2d 247 (Tex.App.—Houston [1st Dist.] 1995, n.w.h.), suggests that the Rogers Group "necessarily sue as representatives of Western Drilling Co., Inc., a corporation whose charter has been forfeited but has not been dissolved, because the Plaintiff–Shareholders would have no standing to sue in their individual capacity." Pointing out that standing, as a part of subject matter jurisdiction, can be raised at any time, even on appeal, it concludes that "unless the Plaintiff–Share-

---

7. Tex. Civ. Prac. & Rem. Code Ann. § 16.003(a).

holders here sue as representatives of Western Drilling, then this court should reach the same result reached in *El T. Mexican Restaurants, Inc.*, 921 S.W.2d at 254, by affirming the judgment in this case." However, as we pointed out above, a majority of the supreme court has expressly quieted title in the Rogers Group. We are bound by that decision; thus, for the purposes of our decision, we must proceed under the assumption that the Rogers Group *en toto* were the possessors of title at all times relevant to the matters underlying this appeal.

In support of its argument that the policy of marketability implicit within § 2.403 supports the conclusion that it was a good faith purchaser of oil from a merchant, Southern Union cites and relies upon § 2.107(a) of the Code. In pertinent part, that section provides that the "sale of minerals ... (including oil ... ) is ... the sale of goods ... if ... severed by the seller" from the realty. We agree that § 2.107(a) is applicable to the sales of the petroleum products here. *Gasmark, Ltd. v. Kimball Energy Corp.*, 868 S.W.2d 925, 928 (Tex.App.—Fort Worth 1994, no writ).

In the course of its argument, Southern Union also cites § 2.403(b) and (c) of the Code. In relevant part, those sections provide:

(b) Any entrusting of possession of goods to a merchant who deals in goods of that kind gives him power to transfer all rights of the entruster to a buyer in ordinary course of business.

(c) "Entrusting" includes any delivery and any acquiescence in retention of possession regardless of any condition expressed between the parties to the delivery or acquiescence and regardless of whether the procurement of the entrusting or the possessor's disposition of the goods have been such as to be larcenous under the criminal law.

Tex. Bus. & Com. Code Ann. § 2.403(b), (c) (Vernon 1994).

Included in the Code section 1.201 are three definitions which are pertinent to our discussion. Relevant portions of those three definitions are:

(9) "Buyer in ordinary course of business" means a person who in good faith and without knowledge that the sale to him is in violation of the ownership rights ... of a third party in the goods buys in ordinary course from a person in the business of selling goods of that kind.... All persons who sell minerals or the like (including oil and gas) at wellhead or minehead shall be deemed to be persons in the business of selling goods of that kind.

(19) "Good faith" means honesty in fact in the conduct or transaction concerned.

\* \* \* \* \* \*

(25) A person has "notice" of a fact when

(A) he has actual knowledge of it; or

(B) he has received a notice or notification of it; or

(C) from all the facts and circumstances known to him at the time in question he has reason to know that it exists.

Tex. Bus. & Com.Code Ann. § 1.201(9), (19), (25) (Vernon 1986).

Section 1.102 of the Code states that the Code should be liberally construed "to make uniform the law among various jurisdictions." Texas Government Code § 311.028 (Vernon 1988), in pertinent part provides "A uniform act ... shall be construed ... to make uniform the law of those states that enact it." Thus, in determining and applying the Texas version of the Uniform Commercial Code, we may consider and apply pertinent decisions from other jurisdictions. *Financial Universal Corp. v. Mercantile Nat'l Bank at Dallas*, 683 S.W.2d 815, 817 (Tex.App.—Dallas 1984, writ ref'd n.r.e.).

In *Toyomenka, Inc. v. Mount Hope Finishing Co.*, 432 F.2d 722 (4th Cir.1970), and in construing a North Carolina Uniform Commercial Code (UCC) section identical to our § 2.403(b), the court determined that for this section to be applicable, there must be three essential steps: 1) an entrustment of goods to 2) a merchant who deals in goods of that kind, followed by a sale by such merchant to 3) a buyer in the ordinary course of business. *Id.* at 727.

In discussing this case and the steps suggested by it, Southern Union argues that if it

acted honestly-in-fact and without knowledge that a sale would injure the ownership rights of the Rogers Group, it would become a good faith purchaser from Torreyana (a selling merchant at the wellhead), if the Rogers Group "acquiesced" in Torreyana's "larcenous" possession of that oil. This follows, it reasons, because the policy implicit within § 2.403(b) is "'to increase the marketability of goods' ... by placing 'a greater burden' on those who 'exercise discretion in entrusting their goods'...."

Southern Union further reasons that in establishing such a good faith defense, "the buyer must only be honest-in-fact and without actual knowledge that his purchase would violate the owner's rights. The UCC's purpose of promoting the marketability of goods, however, does not require such a good faith buyer to undertake burdens of inquiry of any purchase...." In espousing this proposition, Southern Union cites and relies upon *Robison v. Gerber Products Co.*, 765 F.2d 431 (4th Cir.1985).

In the *Robison* case, Gerber had been purchasing peaches from a corporation. The peaches were grown on land owned by a husband and wife who were shareholders in the corporation. When the wife did not receive her share of the proceeds from the sale of the peaches, she sued Gerber for conversion, claiming that a Gerber representative had been informed of the couple's marital difficulties and thus could not be a buyer in the ordinary course of business under South Carolina's counterpart to § 2.403(b) (which is identical to the Texas version).

In rejecting the wife's argument, the court noted that the wife had allowed the corporation to retain possession and control over her portion of the peach crop, she knew the corporation had been selling the peaches to Gerber for several years, and the wife knew the proceeds of the sales went to the corporation. Under these circumstances, the court concluded, the wife's conduct fell squarely within the definition of "entrusting" contained in the UCC. The court also concluded that under the circumstances of that case, Gerber was a buyer in the ordinary course of business, and that "good faith" meant "honesty-in-fact" while "knowledge"

referred to "actual knowledge." In view of the fact that Gerber had been purchasing peaches from the corporation which, in its purchase contract, had represented it "owned and controlled" the farm, the court concluded Gerber had no reason to question that language "and clearly had no duty to inspect title to the real estate on which the peaches were grown." *Robison*, 765 F.2d at 434. The court also held the information that the Robisons might be having marital problems was not sufficient to require Gerber to investigate "the assets and domestic tranquility of the shareholders and, should any hint of marital discord reach its agents, the duty to investigate what effect such disturbance might have on the commercial transaction in which it is involved." *Id.* To do so, it reasoned, would offend the purpose of the UCC in promoting greater negotiability of goods and affording certain protection to participants in the commercial enterprise. *Id.* at 434. Interpreting the rationale of the opinion, Southern Union concludes its teaching is that "a buyer in the ordinary course of business (1) absent actual knowledge of a title defect, has no duty to investigate a merchant's representation of good title and (2) has no duty to investigate title to realty from which personalty has been severed." It concludes that under these authorities, "the greater negotiability uniformly required among the jurisdictions thereby provides a legal basis on which the judgment can be affirmed for Southern Union as a good faith buyer in the usual course of business and not as a convertor."

In response, the Rogers Group argues that Southern Union cannot be entitled to a § 2.403(b) and (c) good faith defense because there was no evidence that the Rogers Group had any actual knowledge of adverse title claims, much less conversion of production, until at least the fall of 1983 and, under the evidence in this case, without such actual knowledge, they cannot be held to have entrusted or acquiesced in the producers' production within the purview of § 2.403(c). They further contend that because the supreme court has held that the E.P. Campbell conveyance deed was a quitclaim and passed no title, as a matter of law, Southern Union

and others of like ilk cannot be bona fide or good faith purchasers.

Southern Union continues its argument with the proposition that the jury findings to questions 5 and 17 are supported by the evidence and furnish a sound factual basis to uphold the judgment. In question 5, as we have noted above and as relevant to this discussion, the jury was asked whether Southern Union had converted oil and gas produced from the property and, in question 17, whether Southern Union, along with Mobil, Amoco and Pride, were good faith purchasers of the production in question. The jury gave a negative answer to question 5 and an affirmative answer to question 17.

Question 5, as we have noted, followed a series of questions in which the jury found that Western Drilling owned only a 1/3 interest in the property and that other defendants owned certain undivided interests. In connection with that question, the jury was instructed:

> Conversion means the exercise of dominion and control over the personal property of another without consent of the owner and to the exclusion of the owner's right of possession and use. Wrongful intent, or bad faith, is not an element.
>
> You are instructed that a Defendant is guilty of conversion if it takes, sells, and/or purchases oil or gas produced from the Subject Property without consent of an owner, or causes another to do so on its behalf.
>
> It is not conversion for a person owning an undivided interest in property to sell oil or gas from the property. It is not conversion to buy oil or gas from a party owning an undivided interest in property.

Considering the supreme court decision quieting title in the Rogers Group, and in view of the questions in which the jury found that others besides the Rogers Group owned undivided interests in the property, the instruction accompanying question 5 was legally erroneous and, at the very least, "nudged" the jury, if it found that others who owned an undivided interest in the property might have been in the chain leading to the sale of petroleum products to Southern Union, to believe and find that no conversion occurred.

Accordingly, the question and the jury's answer must be disregarded and Southern Union's reliance on that question is erroneous.

Turning to consideration of question 17, the jury was instructed that:

> Defendants Southern Union, Mobil [sic] Pride and Amoco have claimed that they were good faith purchasers of the oil in question. You are instructed that a purchaser acting in good faith who pays a valuable or reasonable consideration for legal title to personal property, without notice of the rights of other persons in the property, while relying upon a situation reasonable [sic] calculated to mislead as to the real owner which the real owner has created, permitted to continue or failed to prevent, is a good faith purchaser entitled to protection against the real owner.

In view of the authorities, Southern Union posits that the "broadly submitted" elements provide a basis for affirming the trial court judgment as to them if supported by the evidence. In support of this and citing *Toyomenka, Inc.*, 432 F.2d at 727, it again suggests that under the above authorities, the evidentiary steps in a "good faith purchaser defense" under § 2.403(a) and (b), are (1) the acquiescence in retention of possession, (2) by a merchant who deals in goods of that kind, (3) followed by sale to a buyer in the ordinary course of business.

 Acknowledging that this is a defense upon which it bears the burden, Southern Union correctly reasons that the sufficiency of the evidence to sustain the jury verdict should be measured by the classical legal and factual sufficiency standards. Under those standards, in determining the legal sufficiency of the evidence, the reviewing court considers only the evidence and reasonable inferences that tend to support the finding and disregards all contrary evidence and inferences. *Alm v. Aluminum Co. of America*, 717 S.W.2d 588, 593 (Tex.1986); *King v. Bauer*, 688 S.W.2d 845, 846 (Tex.1985). In measuring factual sufficiency, the reviewing court must consider and weigh all the evidence, and should set aside the finding only if the answer is so contrary to the overwhelming weight of the evidence as to be clearly

wrong and manifestly unjust. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex.1986).

In considering the tripartite steps in determining a § 2.403 good faith purchaser defense, the evidence is amply sufficient to support the second evidentiary step. Torreyana, as the driller, developer, and producer, severed the oil from the realty and offered it for sale. As expressly stated in § 1.201(9), a person selling oil at the wellhead is deemed to be in the business of selling goods of that kind; thus, it was a "merchant" dealing in such goods within the purview of § 2.403(b).

■ As we have noted, the Rogers Group strenuously questions whether the evidence is sufficient to support the first evidentiary step showing acquiescence. "Acquiescence" is defined in Black's Law Dictionary as "to give an implied consent to a transaction...." Black's Law Dictionary 14 (6th ed. 1991). It is reasonable to conclude that before even implied consent to a transaction can be considered, acquiescence requires knowledge of that to which consent is implied. Although knowledge is a state of mind which is often difficult and, at times, impossible to prove by direct testimony, its presence or absence may still be proved by circumstantial evidence. *Southwest Title Ins. Co. v. Plemons*, 554 S.W.2d 734, 737 (Tex.Civ.App.—Dallas 1977, writ ref'd n.r.e.); *Ashby v. State*, 283 S.W.2d 270, 273–74 (Tex.Civ.App.—Dallas 1955, no writ).

In that regard, the factual record reveals the following circumstances bearing on the question of knowledge:

In 1960, E.P. Campbell, although then president of Western Drilling, executed in his individual capacity the "quitclaim" assignment of the lease to Dakota, Inc., a company which the Rogers Group knew he had organized.

In addition to this attempt, the Rogers Group knew of other instances in which Campbell had used assets of Western Drilling for his individual purposes.

There was evidence that about the time of this quitclaim assignment and thereafter, the financial viability of Western Drilling weakened.

By 1964, the corporate charter of Western Drilling was forfeited by the state, indicating Western Drilling was insolvent at that time.

Following E.P. Campbell's death in 1961, K.W. Cecil, Sr., attempted to sell the assets of Western Drilling to pay judgment debts and debts to the Internal Revenue Service, the amount of which various debts was estimated to be between $1,000,000 and $2,000,000.

After the death of K.W. Cecil, Sr., his son, K.W. Cecil, also attempted to sell the assets of Western Drilling and pay debts, a process which continued from 1966 through 1977, with the shareholders paying debts and recording releases.

During the same time frame in which the shareholders were recording releases, the bank foreclosed its purported lien on the lease and recorded the trustee's deed.

In the fall of 1979, Torreyana drilled on the lease under a void assignment, and by that action became a converter of the lease interest, the title to which has been quieted in the Rogers Group by the supreme court.

Four producing oil wells were drilled on the premises in 1979, at a time when several shareholders of the Rogers Group lived in the area.

The Rogers Group shareholders were aware that there were leases in Western Drilling's name and discussed whether there might be properties in which they could assert an interest.

The Rogers Group shareholders were familiar with the lease in question and considered it to be an asset of Western Drilling.

Under all circumstances of this record, given the Rogers Group's knowledge of the lease, the continuing recordation of releases, the fact they resided in the area, the discussions concerning asserting an interest in the leases, and the passage of a substantial period of time after the drilling of the producing wells, the jury's answer is not so against the overwhelming weight and preponderance of the evidence as to be clearly wrong and manifestly unjust.

The third prong of the tripartite test is the requirement that Southern Union be a buyer in the ordinary course of business. To meet that test, Southern Union must have been honest-in-fact and without knowledge that its oil purchases were in violation of ownership rights of the Rogers Group. The Rogers Group does not contest that Southern Union paid a valuable consideration (market value) for its purchases of oil; however, in emphasizing that Southern Union could not be a buyer in the ordinary course of business, the Rogers Group places heavy reliance upon the fact that Southern Union received a November 6, 1979 title opinion before it began to purchase oil. Although the title opinion shows the lessor's royalty interest owned by the Dean Estate, the overriding royalty interest owned by Superior, the working interest owned by Torreyana, OPECO Consultants, Craft, Ortego, and Ricane, and did not expressly find any title to be vested in Western Drilling, the attorney giving the opinion did observe that the conveyance by E.P. Campbell was executed in his individual capacity, and not in his capacity as president of the corporation. In connection with that observation, the examining attorney required a recordable affidavit be obtained "satisfactorily establishing authority of E.P. Campbell to execute the instrument noted in the chain." It is the Rogers Group's position that that observation and that requirement is sufficient to prevent Southern Union from claiming the protection of a buyer in the ordinary course of business.

In response, Southern Union cites the testimony of their expert witness, Maston Courtney. In his opinion, inasmuch as the title opinion reflected no "imminent" title defects, the burden would be on Torreyana to meet any title requirements and not upon the purchaser of the oil. He also observed there was nothing to indicate that Southern Union made any independent inquiry as to title and concluded that Southern Union would be entitled to rely upon the fact that Mobil had purchased two years of production without notice of an adverse claim. Thus, Southern Union posits, at the very least, the evidence raised disputed questions of fact on all elements of Southern Union's status as a buyer in the ordinary course of business.

For the purposes of the § 1.201(19) definition of "good faith" as "honesty in fact in the conduct or transaction concerned," the good faith of a purchaser does not expressly or impliedly require lack of knowledge of third party claims. *Peerless Equipment Co. v. Azle State Bank,* 559 S.W.2d 114, 116 (Tex.Civ.App.—Fort Worth 1977, no writ); *Brumley Estate v. Iowa Beef Processors, Inc.,* 704 F.2d 1351, 1362 (5th Cir.1983). In that respect, the Code deviates from the common law. *Peerless,* 559 S.W.2d at 116.

Our supreme court has explicated that the test for good faith, *i.e.,* honesty in fact in the conduct or transaction, is the actual belief of the party in question, not the reasonableness of the belief. *La Sara Grain Co. v. First Nat'l Bank of Mercedes,* 673 S.W.2d 558, 563 (Tex.1984) citing *Riley v. First State Bank of Spearman,* 469 S.W.2d 812 (Tex.Civ.App.—Amarillo 1971, writ ref'd n.r.e.). In the *Riley* case, this court commented, "[t]he test is not diligence or negligence; and it is immaterial that appellee may have had notice of such facts as would put a reasonably prudent person on inquiry which would lead to discovery, unless appellee had actual knowledge of facts and circumstances that would amount to bad faith." *Id.* at 816. In Black's Law Dictionary, "bad faith" is defined as "not simply bad judgment or negligence, but rather it implies the conscious doing of a wrong because of dishonest purpose or moral obliquity; it is different from the negative idea of negligence in that it contemplates a state of mind affirmatively operating with a furtive design or ill will." Black's Law Dictionary 94 (6th ed. 1991).

The jury's answer is sufficient to demonstrate its decision that Southern Union actually believed it was protected in purchasing the oil and was not in bad faith in doing so. Measured by the standards we must use, the evidence is sufficient to sustain that decision. Thus, by the jury decision, Southern Union is a good faith buyer within the purview of the Code and, as such, is not liable for the conversion damages sought from it by the Rogers Group. Southern Union also disclaimed any interest in the leasehold estate itself.

## MOBIL

The record shows that Mobil's purchases of oil occurred between November 1979 and February 1981. This suit was filed April 2, 1984. For reasons we expressed above, the two-year statute of limitations is applicable to any conversion claims by the Rogers Group. That being true, the Rogers Group's conversion claims against Mobil are barred by limitations. Mobil also disclaimed any interest in and to the leasehold interest.

## J.C. CRAFT AND CALVIN ORTEGO

The record shows that Craft and Ortego were not included as parties in this suit until the Rogers Group filed their second amended original petition on April 2, 1985. It also shows they last took oil in April 1983. That being true, the Rogers Group's conversion claim against them which arose prior to April 2, 1983, is time barred and Craft and Ortego may only be liable for amounts they received subsequent to that date. Craft and Ortego also disclaimed any ownership interest in the leasehold estate itself.

## AMOCO PRODUCTION COMPANY AND PRIDE COMPANIES

In making its answer to question 17, the jury also found that Amoco and Pride were good faith purchasers of the production in question here. Accordingly, for the reasons we advanced in our discussion of Southern Union's position, that verdict is sufficient to establish that Amoco and Pride, as well as Southern Union, were purchasers in good faith as far as conversion claims against them are concerned.

## BROCK RESOURCES, INC.

The Rogers Group included among the defendants in this suit the Argonaut Energy Corporation. Before this suit proceeded to trial, Argonaut filed Chapter 11 bankruptcy and emerged as Brock Resources, Inc. (Brock). On April 17, 1987, the bankruptcy court lifted its stay and permitted the Rogers Group "to pursue their lawsuit against the Debtor (Argonaut/Brock) in the 286th District Court of Cochran County, Texas and the Amarillo Court of Appeals." On July 14, 1989, the Rogers Group made demand upon Brock to abandon all its claims to the lease and to any escrow funds. On May 31, 1990, the trial court entered a interlocutory order providing that

> [T]he material allegations of Plaintiffs' pleadings on file in this cause, ... be and the same are deemed admitted as to Defendants ARGONAUT ENERGY CORPORATION, BROCK RESOURCES, INC., MEYER, MORITZ & COMPANY, INC., TORREYANA OIL CORPORATION, OPECO ENERGY, INC., TOM MEREDITH, PATRICK L. HELTON, ALLEN HARRISON, AND JERRY MORITZ, and that Plaintiffs have and recover of and from the Defendants hereinabove named such sums of money and other relief as may be proved upon the trial of this cause, at which time a final judgment shall be entered finalizing this interlocutory judgement to be provided.

The Rogers Group contends the trial judge erred in refusing to submit damages and attorney fees issues against Brock. In making that contention, they argue that Brock committed a new and post-bankruptcy wrong by failing to disclaim funds held in suspense by Pride and by failing to disclaim title to the lease after the Rogers Group made demand upon them to do so. In response, Brock contends it did not commit a new actionable wrong by failing to "abandon title litigation already in progress that was allowed to continue in state court by order of the Bankruptcy court." It also contends that because the Rogers Group was awarded Brock's interest in the lease and suspended funds by the May 31, 1990 judgment, there was nothing left to submit to the jury as to Brock.

We agree with the Rogers Group that because Brock continued to claim title adversely to the Rogers Group after demand was made, it was necessary for the Rogers Group to prevail in the trespass to try title suit. Brock's continual title claim was a post-bankruptcy conversion. Thus, by provision of Tex. Civ. Prac. & Rem. Code Ann. § 16.034 (Vernon 1986), the Rogers Group was entitled to ask for the award of attorney fees incurred because of the necessity to establish its title as against Brock, *Brownlee*

*v. Sexton,* 703 S.W.2d 797 (Tex.App.—Dallas 1986, writ ref'd n.r.e.), as well as any other special damages they may be able to establish at trial.

## JERRY I. MORITZ

Jerry I. Moritz (Moritz) contends the trial court properly instructed a verdict in his favor as far as damages and did not abuse its discretion in vacating an interlocutory sanction order against him for a failure to comply with pretrial discovery and with orders of the trial court.

 The Rogers Group contends that Moritz's failure to answer requests for admission and other discovery, and the trial court's order based thereon, conclusively proved their case against him, thereby requiring reversal of the trial court's judgment and rendition of judgment against him. However, the trial court did not incorporate its previous sanction order into its final judgment. Moritz correctly contends that orders imposing this type of sanction are interlocutory in nature, *Warford v. Childers,* 642 S.W.2d 63, 65 (Tex.App.—Amarillo 1982, no writ), the trial court has discretion to set aside or vacate interlocutory orders, *Mathes v. Kelton,* 569 S.W.2d 876, 878 (Tex.1978), including interlocutory default judgments, *Houston Health Clubs Inc. v. First Court of Appeals,* 722 S.W.2d 692, 693–694 (Tex.1986), even upon its own motion. *Dickerson v. Mack Financial Corp.,* 452 S.W.2d 552, 555–56 (Tex.Civ.App.—Houston [1st Dist.] 1969, writ ref'd n.r.e.). The trial court's granting of the judgment in favor of Moritz was inconsistent with its prior action, the effect of which was to negate the earlier rulings.

 The standards of review of a directed verdict case are well established. A party is entitled to a directed verdict when reasonable minds can draw only one conclusion from the evidence. The task of an appellate court in such a case is to determine whether there is any evidence of probative force to raise fact issues on the material questions presented. The reviewing court must consider all the evidence in the light most favorable to the party against whom the verdict was instructed, disregarding all contrary evidence and inferences. When rea-

sonable minds may differ as to the truth of controlling facts, the issue must go to the jury. *Collora v. Navarro,* 574 S.W.2d 65, 68 (Tex.1978); *Matter of the Estate of Crawford,* 795 S.W.2d 835, 838 (Tex.App.—Amarillo 1990, no writ).

 By deposition, Patrick L. Helton testified that in the period from March 1983 until September 1983 in which the Meyer–Moritz corporation claimed a 55% working interest, the witness, Al Harrison, and Moritz had an unrecorded interest. Specifically, he said that for that period of time they had "received the benefit of the runs and had also paid the operating cost." There is evidence in the record indicating that Meyer–Moritz was paid some $32,138.03 in oil and gas payments during this period of time.

 Pointing out that this testimony was received after the Rogers Group had rested, and without citation of relevant authority, Moritz argues this testimony should not be considered in determining whether the instructed verdict was justified. We disagree. The rule requires that all the evidence in the record at the time the trial court makes its ruling be considered. The deposition testimony was in the record at the time of the ruling and must be considered in our determination.

Viewed in the light in which we must view it, there was some evidence to raise a fact question whether Moritz had received payments which should have been made to the Rogers Group in whom title has been quieted. Accordingly, the trial court erred in granting Moritz's motion and rendering judgment in his favor.

## WILLBROS ENERGY SERVICES f/k/a CORDOVA RESOURCES, INC.

 Willbros initially argues the trial court erred in granting the Rogers Group's eighth motion for partial summary judgment which precluded it from trying its promissory estoppel claim to the jury. The requisites of promissory estoppel are 1) a promise, 2) foreseeability by the promisor of reliance thereon, and 3) substantial reliance by the

promisee to his detriment. *English v. Fischer*, 660 S.W.2d 521, 524 (Tex.1983).

In support of its argument, Willbros points to evidence it says was introduced by the Rogers Group that concerns an alleged promise by Norman Rogers[8] to deliver a quitclaim deed, as well as testimony that in reliance thereon, Willbros representative Mantz "broke up meetings at Willbros, purchased a plane ticket, flew to Lubbock, rented a car and drove to Mr. Rogers' home." These facts, it contends, raise fact questions sufficient to require decision by a factfinder; however, while the supreme court did not specifically discuss this question in its opinion, by its unequivocal holding quieting title in the Rogers Group, it forestalled the relitigation of any additional challenges to their title.

For reasons which we expressed in our discussion of Southern Union's position and in view of the supreme court decision quieting title in the Rogers Group, jury question 5, and the answer to it, in which the jury found that Willbros had not converted oil and gas, must be set aside.

Willbros also contends that the Rogers Group is not entitled to recover funds paid to Cordova for expenses incurred from October 5, 1984 through June 30, 1985, in connection with "Appellants' (Rogers Group) initial Motion for Appointment of Receiver." However, under this record, the record is not fully developed in regard to that question. Because a remand of this case is necessary in several respects, the question whether Willbros is entitled to reimbursement for expenses and, if so, how much reimbursement to which it is entitled, should be determined upon that retrial. *See Morrow v. Shotwell*, 477 S.W.2d 538, 541–42 (Tex.1972).

▬▬▬ Additionally, under this record, the jury's answer to question 8 refusing to award the Rogers Group any attorney fees must be disregarded. This is particularly true in view of the supreme court decision quieting title in the Rogers Group which demonstrates error in the trial court judgment. Under Tex. Civ. Prac. & Rem. Code Ann. § 16.034(a), the prevailing party in a

trespass to try title suit such as this one may be awarded attorney fees by the court. *Pierce v. Gillespie*, 761 S.W.2d 390, 397 (Tex. App.—Corpus Christi 1988, no writ) (on motion for rehearing); *Knupp v. Miller*, 858 S.W.2d 945, 955 (Tex.App.—Beaumont 1993, writ denied). In that connection, we have not overlooked the Rogers Group's request that we instruct the trial court on remand what evidence should be admitted regarding that question; however, we cannot anticipate what evidence will appear at the retrial. Any opinion we could give would be, by its very nature, an advisory opinion. Appellate courts have no jurisdiction to render advisory opinions. *Morrow v. Corbin*, 122 Tex. 553, 62 S.W.2d 641, 646–47 (1933); *University Interscholastic League v. Jones*, 715 S.W.2d 759, 761 (Tex.App.—Dallas 1986, writ ref'd n.r.e.), *cert. denied*, 484 U.S. 821, 108 S.Ct. 81, 98 L.Ed.2d 43 (1987).

The supreme court decision quieting title in the Rogers Group also requires remand to the trial court for decision by a factfinder as to the amount of damages to which the Rogers Group might show themselves properly entitled because of the adverse claims to title asserted by the defendants that are not time barred under Tex. Prop. Code Ann. § 22.021(d). That remand is also necessary for determination of the validity and amount of claims made by any of the appellees for improvements made in good faith to which they might show themselves entitled by virtue of Tex. Prop.Code Ann. § 22.021(a), (b) & (c).

In accordance with the opinion of the supreme court and our prior discussion:

1. The portion of the trial court judgment in which it found title in others than the Rogers Group is reversed, the portion of the suit in which the Rogers Group sought judgment quieting title to the leasehold working interest in the tract in question from the surface down to a depth of 5,200 feet is severed, and judgment is rendered quieting title to that leasehold working interest in the Rogers Group against all the defendants.

2. Because the answer of the jury to question 17 was sufficiently supported by the

---

8. Norman Rogers is the alleged spokesperson for the Rogers Group.

trial evidence, the judgment in favor of Southern Union, Amoco, and Pride is affirmed insofar as it denies any recovery against them by the Rogers Group for conversion of petroleum products, and because Southern Union and Amoco disclaimed any interest in the leasehold estate sought by the Rogers Group, the trial court judgment denying the Rogers Group any recovery against them is affirmed.

3. Because the record shows the Rogers Group's conversion claims against Mobil to be time barred, and because Mobil also disclaimed any interest in the leasehold estate, the trial court judgment denying the Rogers Group any recovery against it is affirmed.

4. With the exception of the portions of the suit which we have severed and rendered judgment upon, the judgment of the trial court is reversed and the cause remanded for retrial.

### ON MOTIONS FOR REHEARING

We have given careful consideration to the motions for rehearing filed in this case. However, with the exception of the motion filed by J.C. Craft and Calvin Ortego, we remain satisfied that our original disposition was correct and overrule all motions for rehearing with the exception of the Craft and Ortego motion.

In our original disposition of the claims against Craft and Ortego, after noting the record showed they last took oil in April 1983, we held any conversion claim by the Rogers Group against Craft and Ortego, which arose prior to April 2, 1983, was time barred. Therefore, they were only liable for any amounts of production they received subsequent to that time. We also noted that Craft and Ortego had disclaimed any interest in the leasehold estate.

In their motion for rehearing, Craft and Ortego have pointed out the portions of the record showing that the Plaintiffs' Second Amended Original Petition, in which they were made parties for the first time, was not filed until August 15, 1985. Thus, as we have held the two-year statute of limitations was applicable to any conversion claims by the Rogers Group, and because the record shows that Craft and Ortego did not receive production subsequent to April 1983, the conversion claims against Craft and Ortego were time barred.

Accordingly, Craft and Ortego's motion for rehearing is granted and our prior judgment is modified only to the extent that it provide that the trial court judgment denying the Rogers Group any recovery against J.C. Craft and Calvin Ortego is affirmed.